**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-2496**

ROBERT YATES, MJG-08-269; ALAN S. BARRY, MJG-08-269; DAVID
YOUNG, MJG-08-269; CARLO HORNSBY; ED FRIEDLANDER,
MJG-08-269; PAUL ENGEL, individually and on behalf of all
others similarly situated MJG-08-292; WILLIAM D. FELIX;
DAVID KREMSER, on behalf of himself and on behalf of Elk
Meadow Investments, LLC; CHARLES W. DAMMEYER, on behalf of
himself and others similarly situated,

Plaintiffs – Appellants,

and

F. RICHARD MANSON, individually and on behalf of, all
others similarly situated MJG-08-269; GEETA SHAILAM,
individually and on behalf of all others similarly situated
MJG-08-386; MICHAEL J. CIRRITO, individually and on behalf
of all others similarly situated MJG-08-476; JOHN J.
HUFNAGLE, individually and on behalf of all others
similarly situated MJG-08-579; WILLIAM JOHNSTON,
derivatively on behalf of Municipal Mortgage & Equity, LLC
MJG-08-670; ROBERT STAUB, derivatively on behalf of
Municipal Mortgage & Equity, LLC MJG-08-802; THE MARY L.
KIESER TRUST, by Mary L. Kieser and Ralph F. Kieser,
Trustees, derivatively and on behalf of Nominal Defendant,
Municipal Mortgage & Equity LLC MJG-08-805; JUDITH
GREENBERG; JOSEPH S. GELMIS, individually and on behalf of
all others similarly situated MJG-08-2133; ARNOLD J. ROSS,
MJG-08-2133; TROY BROY; JULES ROTHAS, individually and on
behalf of all others similarly situated MJG-08-2134; NAOMI
RAPHAEL; FAFN/SLATER GROUP; KREMSER GROUP, MJG-08-269,

Plaintiffs,

v.

MUNICIPAL MORTGAGE & EQUITY, LLC; MELANIE M. LUNDQUIST;
MICHAEL L. FALCONE; MERRILL LYNCH PIERCE FENNER AND SMITH
INCORPORATED; RBC CAPITAL MARKETS, LLC.; MARK K. JOSEPH;

CHARLES C. BAUM; EDDIE C. BROWN; ROBERT S. HILLMAN; DOUGLAS A. MCGREGOR; ARTHUR S. MEHLMAN; FRED N. PRATT, JR.; RICHARD O. BERNDT; WILLIAM S. HARRISON; DAVID KAY; CHARLES M. PINCKNEY,

        Defendants – Appellees,

   and

GARY A. MENTESANA; BARBARA B. LUCAS; EARL W. COLE, III; ANGELA B. BARONE,

        Defendants.

---

Appeal from the United States District Court for the District of Maryland, at Baltimore.  Marvin J. Garbis, Senior District Judge.  (1:08-md-01961-MJG)

---

Argued:  October 30, 2013          Decided:  March 7, 2014

---

Before DIAZ and FLOYD, Circuit Judges, and Joseph F. ANDERSON, Jr., United States District Judge for the District of South Carolina, sitting by designation.

---

Affirmed by published opinion.  Judge Diaz wrote the opinion, in which Judge Floyd and Judge Anderson joined.

---

**ARGUED**: David A.P. Brower, BROWER PIVEN, New York, New York, for Appellants.  Mark Holland, New York, New York, William M. Jay, GOODWIN PROCTER LLP, Washington, D.C.; Jason J. Mendro, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellees. **ON BRIEF**: Charles J. Piven, Yelena Trepetin, BROWER PRIVEN, Stevenson, Maryland; Sherrie R. Savett, Barbara A. Podell, Eric Lechtzin, BERGER & MONTAGUE, P.C., Philadelphia, Pennsylvania; Kim E. Miller, KAHN SWICK & FOTI, LLC, New York, New York; Susan K. Alexander, Andrew S. Love, ROBBINS GELLER RUDMAN & DOWD LLP, San Francisco, California, for Appellants.  Jonathan C. Dickey, GIBSON, DUNN & CRUTCHER LLP, New York, New York, for Appellees Merrill Lynch Pierce Fenner and Smith Incorporated, and RBC Capital Markets, LLC.  Mary K. Dulka, GOODWIN PROCTER LLP, New York, New York; Anthony Candido, CLIFFORD CHANCE LLP, New York,

New York; Stephen A. Goldberg, Ward B. Coe III, GALLAGHER EVELIUS & JONES LLP, Baltimore, Maryland, for Appellees Municipal Mortgage & Equity, LLC, Mark K. Joseph, William S. Harrison, Charles M. Pinckney, and David Kay. William M. Krulak, Jr., MILES & STOCKBRIDGE P.C., Baltimore, Maryland, for Appellees Charles C. Baum, Richard O. Berndt, Eddie C. Brown, Robert S. Hillman, Douglas A. McGregor, Arthur S. Mehlman, and Fred N. Pratt, Jr. Charles O. Monk, II, Geoffrey M. Gamble, SAUL EWING LLP, Baltimore, Maryland, for Appellee Michael L. Falcone. David W.T. Daniels, RICHARDS KIBBE & ORBE LLP, Washington, D.C., for Appellee Melanie Lundquist.

————————————

DIAZ, Circuit Judge:

This case involves claims that Municipal Mortgage & Equity ("MuniMae" or the "Company"), and certain of its officers and directors (collectively, the "MuniMae defendants"), violated federal securities laws.[1] Plaintiffs, both individually and as class representatives, contend that the MuniMae defendants committed securities fraud by (1) falsely representing that the Company was in full compliance with a new accounting standard enacted in 2003; and (2) concealing the substantial cost of correcting the accounting error. Plaintiffs allege that they relied on the integrity of the market price of the Company's stock, and that, as a result of the MuniMae defendants' fraudulent conduct, investors paid an artificially inflated price for MuniMae shares during the class period.

The district court dismissed plaintiffs' claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, finding that the amended complaint failed to adequately plead scienter, or wrongful intent. The court also dismissed claims under §§ 11, 12(a)(2), and 15 of the Securities Act of 1933 relating to a secondary public offering ("SPO"). The court

---

[1] Plaintiffs also sued Merrill Lynch, Pierce, Fenner & Smith, Inc. and RBC Capital Markets Corp., who served as lead underwriters in a secondary public offering conducted by MuniMae in 2005.

found the § 11 claim time-barred by the applicable statute of repose, and that plaintiffs lacked standing to bring the § 12(a)(2) claim. It dismissed the § 15 claim because plaintiffs failed to adequately plead a primary violation of the Securities Act.[2]

For the reasons that follow, we affirm.


I.

In reviewing the district court's dismissal under Federal Rule of Civil Procedure 12(b)(6), "we 'accept all factual allegations in the complaint as true.'" Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc., 576 F.3d 172, 176 (4th Cir. 2009) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, (2007)). And as did the district court, we take judicial notice of the content of relevant SEC filings and other publicly available documents included in the record. See In re PEC Solutions, Inc. Sec. Litig., 418 F.3d 379, 390 & n.10 (4th Cir. 2005).

---

[2] The district court refused to dismiss three other claims alleging violations of the Securities Act. After some procedural skirmishing not relevant to this appeal, the parties filed a joint motion requesting that the district court certify the dismissed claims as final pursuant to Federal Rule of Civil Procedure 54(b). Finding no just reason for delay, the court granted the motion. We are satisfied that the district court acted appropriately in certifying its order under Rule 54(b). See Culosi v. Bullock, 596 F.3d 195, 203 (4th Cir. 2010).

A.

The putative class period for this case spans from May 3, 2004, to January 29, 2008. During that period, MuniMae was one of the nation's largest syndicators of low-income housing tax credits ("LIHTCs"). Federal tax law provides LIHTCs to developers of low-income rental housing. Because most developers cannot take advantage of these credits, financial services companies, like MuniMae, organize LIHTC investment partnerships ("LIHTC Funds") to pool and sell the credits to investors.

MuniMae usually acted as the general partner of its LIHTC Funds during the class period, and it received syndication and asset management fees for organizing and maintaining them. Although its ownership share was generally low, ranging from 0.1% to 1.0%, it was typically larger than that of any single investor. Prior to 2003, MuniMae primarily treated these LIHTC Funds as off balance sheet entities.

In 2003, the Financial Accounting Standards Board adopted Financial Accounting Standards Board Interpretation No. 46R ("FIN 46R"), which addressed the financial reporting requirements of businesses with respect to off balance sheet

6

activity.[3]  FIN 46R defined a new category of entities called Variable Interest Entities ("VIEs").  Under FIN 46R, a company must consolidate onto its financial statements the assets and liabilities of a VIE if the company is its "primary beneficiary," that is, if the company absorbs the majority of the risks and rewards associated with the VIE.  Before the adoption of this revised standard, a company was generally only required to consolidate financial statements if it had a majority voting interest in the entity.

The first quarter of 2004 was the first period for which MuniMae reported compliance with FIN 46R.  The Company then concluded that FIN 46R required it to consolidate some but not all of its LIHTC Funds, which added a net $1.3 billion in assets and liabilities to the Company's financial statements.  The remaining unconsolidated LIHTC Funds had net assets of approximately $970.3 million and liabilities of approximately $90.8 million.

Through mid-2006, MuniMae continued to represent its compliance with FIN 46R in financial reports filed with the SEC. PricewaterhouseCoopers LLP ("PwC"), MuniMae's independent public accountant, certified that those reports had been prepared in

---

[3] The Board initially adopted FIN 46 in January 2003.  In December 2003, it approved various amendments to FIN 46 and released FIN 46R.

7

accordance with generally accepted accounting principles ("GAAP") for fiscal years 2004 and 2005. Between 2004 and 2006, the Company also made a number of acquisitions and conducted several offerings, including an SPO in February 2005. At the end of 2005, Melanie Lundquist replaced William Harrison as the Company's CFO.

On March 10, 2006, MuniMae announced that it was restating its financial statements for the nine-month period ending on September 30, 2005, as well as fiscal years 2002 through 2004. The restatement corrected certain financial reporting errors that were unrelated to FIN 46R. MuniMae issued the restated financial statements in June 2006.

In August, the Company disclosed that it had identified "material weaknesses in internal controls over financial reporting," and that, as a result, it would be unable to "file timely its second quarter 2006 Form 10-Q." J.A. 65. A few months later, on September 13, 2006, MuniMae announced that it was again restating its financial statements for fiscal years 2003 through 2005, and for the first quarter of 2006. The Company initially informed investors that the second restatement would address three areas: (1) accounting for equity commitments related to affordable housing projects; (2) the classification of cash flow from tax credit equity funds; and (3) accounting for syndication fees. About a month later,

8

however, MuniMae disclosed that it had "not yet reached a conclusion regarding the extent of the [second] restatement." J.A. 1120.

On October 26, 2006, MuniMae announced that it was replacing PwC as the Company's independent public accountant. The Company stated--and PwC agreed--that for fiscal years 2004 and 2005, and through October 2006, "there were no disagreements with PwC on any matter of accounting principles or practices, financial statement disclosure or audit scope or procedure which disagreements if not resolved to the satisfaction of PwC would have caused them to make reference thereto in their reports on [MuniMae's] financial statements." J.A. 1120.

Three months later, the Company reported its 40th consecutive increase in its quarterly dividend. In the same announcement, the Company revealed that the second restatement would address accounting errors with respect to FIN 46R, and that the Company would "be required to consolidate substantially all of the low income housing tax credit equity funds it has interests in." J.A. 1373.

On May 4, 2007, MuniMae disclosed that it would not be able to timely file its 10-K for 2006 "[a]s a result of the dedication of significant management resources to . . . restatement efforts." J.A. 1129. The Company noted that since September 2006, it had identified additional material weaknesses

9

in its internal controls over financial reporting, including with respect to its accounting of LIHTC Funds.

On July 10, 2007, MuniMae announced that it had hired Navigant Consulting to assist its internal auditors in the restatement. A month later, it disclosed more details about the scope of the effort, noting that "there are approximately 92 people currently working on the restatement," including "20 company employees and 72 consultants." J.A. 1145. Around the same time, Lundquist resigned and Charles Pinckney replaced her as CFO.

MuniMae held a teleconference on November 8, 2007 to further update investors. The Company stated that management planned to ask the Board to continue the Company's longstanding policy of increasing the dividend distribution every quarter, although it warned that "it is possible that the dividend payout ratio for the full fiscal year 2007 may exceed 100% of the Company's net cash from operations due to the costs being incurred by the Company from the restatement." J.A. 1155. The Company's officers declined at that point to estimate the cost of the second restatement, though they acknowledged the costs were substantial.

On January 28, 2008, MuniMae announced that it was cutting its quarterly dividend by 37%, from $0.525 to $0.33 per share. The Company attributed the cut to "the cost of the Company's

10

ongoing restatement of its financial statements, the decision . . . to conserve capital . . . given the current volatility in the credit and capital markets, and the desire to dedicate additional capital to the high-growth Renewable Energy Finance business." J.A. 1171. At the same time, the Company stated that it did "not believe the results of the restatement w[ould] materially change the previously recorded cash balances of the Company and its subsidiaries." Id. Because the restatement efforts were still ongoing, the Company also announced that it anticipated being delisted from the New York Stock Exchange because it could not meet a NYSE deadline for filing its 2006 Form 10-K. The price of MuniMae shares dropped 46.57%, from $17.20 per share on January 28, to $9.19 per share on January 29, on unusually heavy trading volume.

MuniMae provided further details to investors regarding the second restatement during a January 29 conference call. With respect to FIN 46R, the Company disclosed that it had to consolidate 230 LIHTC Funds, which required it to review 6,000 separate financial statements. Because the Company had no automated process in place to review the accounting, this work had to be done manually. Acknowledging that these developments were a result of the Company's "mistakes in the first instance[,]" CEO Michael Falcone expressed his disappointment and embarrassment over the "the amount of time and energy and

11

effort[] it's taking us to fix them." J.A. 1196. The price of MuniMae shares dropped an additional 22.416%, to $7.13 per share, on January 30, again on unusually heavy trading volume. On April 9, 2008, MuniMae disclosed that it spent $54.1 million to complete the second restatement.

B.

Shareholders filed multiple lawsuits against MuniMae, certain of its officers and directors, and the lead underwriters in the 2005 SPO, alleging violations of federal securities laws. The actions were consolidated in the District of Maryland for pretrial proceedings. See In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig., 571 F. Supp. 2d 1373 (J.P.M.L. 2008). Plaintiffs filed the operative Consolidated Amended Class Action Complaint on December 5, 2008.

Applying the heightened pleading standards of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, the district court held that plaintiffs' Exchange Act claims failed because the amended complaint did not adequately plead scienter. See In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig., 876 F. Supp. 2d 616, 647 (D. Md. 2012). The court also dismissed plaintiffs' Securities Act claims with respect to the SPO. It found the § 11 claim time-barred by the statute of repose in § 13 of the Securities Act. See id. at 657. It also concluded that Charles Dammeyer, the only named

12

plaintiff asserting Securities Act claims with respect to the SPO, lacked standing to bring a § 12(a)(2) claim, see id. at 661, and that the amended complaint failed to adequately plead that the underwriter defendants were immediate sellers, see id. at 662.

This appeal followed.

## II.

### A.

We first consider the district court's dismissal of plaintiffs' claims under § 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 for failing to adequately plead scienter.

The purpose of the Exchange Act and its accompanying regulations is to ensure that companies disclose the information necessary for investors to make informed investment decisions. See Taylor v. First Union Corp. of S.C., 857 F.2d 240, 246 (4th Cir. 1988). Section 10(b) of the Act prohibits the use of "any manipulative or deceptive device or contrivance" in connection with the sale of a security in violation of SEC rules. See 15 U.S.C. § 78j(b). Rule 10b-5 implements § 10(b) by making it unlawful, in connection with the sale of a security:

(a) To employ any device, scheme, or artifice to defraud,

13

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b-5. The Supreme Court has recognized that § 10(b) provides an implied right of action for purchasers or sellers of securities who have been injured by violations of the statute. See Stoneridge Inv. Partners v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008).

In a typical § 10(b) action, a private plaintiff must prove six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Id.

To establish scienter, a plaintiff must prove that the defendant acted with "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, 551 U.S. at 319 (internal quotation marks omitted). At the pleading stage, alleging either intentional or severely reckless conduct is sufficient. See Matrix Capital, 576 F.3d at 181. In the § 10(b) context, a reckless act is one that is "so highly unreasonable and such an extreme departure from the standard of

14

ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Id. (internal quotation marks omitted).

The PSLRA imposes a heightened pleading standard on fraud allegations in private securities complaints. See Teachers' Ret. Sys. of La. v. Hunter, 477 F.3d 162, 171-72 (4th Cir. 2007). The complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" with respect to each act that allegedly violated the statute. 15 U.S.C. § 78u-4(b)(2). "[T]o the extent a plaintiff alleges corporate fraud, the plaintiff must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation." Matrix Capital, 576 F.3d at 182 (internal quotation marks omitted). To allege fraud against an individual defendant, the plaintiff must allege facts supporting a strong inference of scienter as to that person. See id.

Evaluating the strength of an inference is necessarily a comparative inquiry. See Tellabs, 551 U.S. at 326-27. "[A]n inference of scienter can only be strong . . . when it is weighed against the opposing inferences that may be drawn from the facts in their entirety." Cozzarelli v. Inspire Pharm. Inc., 549 F.3d 618, 624 (4th Cir. 2008). "A court must compare

15

the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 991 (9th Cir. 2009).

As applied here, "the question is whether the allegations in the complaint, viewed in their totality and in light of all the evidence in the record, allow us to draw a strong inference, at least as compelling as any opposing inference," that the MuniMae defendants either knowingly or recklessly defrauded investors by (1) issuing false financial statements as to the Company's compliance with FIN 46R, and (2) concealing the cost of correctly consolidating LIHTC Funds in accordance with that standard. See Pub. Emps.' Ret. Ass'n of Co. v. Deloitte & Touche LLP, 551 F.3d 305, 313 (4th Cir. 2009). "If we find the inference that defendants acted innocently, or even negligently, more compelling than the inference that they acted with the requisite scienter, we must affirm." Id.

## B.

### 1.

We begin by considering whether the facts alleged in the amended complaint give rise to an inference of scienter and, if so, the strength of that inference. Although "we ultimately evaluate plaintiffs' allegations of scienter holistically, we

16

only afford their allegations the inferential weight warranted by context and common sense." Matrix Capital, 576 F.3d at 183. Plaintiffs rely on four categories of allegations as to scienter, to which we now turn.

### a. Confidential Witness Statements

The amended complaint incorporates information obtained from three confidential witness ("CW") statements. "When the complaint chooses to rely on facts provided by confidential sources, it must describe the sources with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged or in the alternative provide some other evidence to support their allegations." Teachers' Ret., 477 F.3d at 174 (internal quotation marks omitted). "[O]missions and ambiguities count against" an inference of scienter because a complaint's factual allegations must be stated with particularity. Tellabs, 551 U.S. at 326; see also Institutional Investors Grp. v. Avaya, Inc., 564 F.3d 242, 263 (3d Cir. 2009) (noting that courts should steeply discount allegations from confidential sources that lack sufficient indicia of reliability). We present the allegations of each of the confidential witnesses before assessing the strength of the scienter inferences they support.

17

### i. Confidential Witness 3

CW3 served as a staff accountant and later a project manager in MuniMae's Internal Accounting Department. CW3 attended accounting meetings with several of the individual defendants. According to CW3, MuniMae executives considered restating the Company's financial statements for months prior to the announcement of the first restatement, in March 2006. CW3 also asserts that, at some point prior to the first restatement, a PwC partner advised MuniMae to consolidate the remaining LIHTC Funds, but certain MuniMae executives disagreed with that recommendation. Specifically, "CW3's bosses . . . argued with PwC about how to classify the tax credit equity funds and how to determine the percentage of ownership MuniMae held on each one." J.A. 84.[4]

CW3 also states that the Company was "'always'" in a state of "'some confusion and chaos'" as a result of MuniMae's rapid expansion. J.A. 68. As CW3 describes, the Company's accounting and legal staff was "bombarded with documentation" as the Company expanded but lacked sufficient personnel to handle the paper flow. J.A. 68-69. According to CW3, "the staff was

---

[4] According to CW3, the PwC partner assigned to the MuniMae account considered the Company's audits to be "exceedingly challenging" because MuniMae was a "'high level, complex company' that required a sophisticated external auditing process in order to comply with FIN 46." J.A. 84.

unprepared professionally for the complex nature of the accounting needed, particularly compliance with FIN 46R." J.A. 69.

### ii. Confidential Witness 2

CW2 served as an in-house certified public accountant from late 2005 to April 2007. CW2 reported directly to then-CFO Lundquist and MuniMae's Chief Accounting Officer, Greg Thor. CW2 asserts that by early 2006, Lundquist and Thor had concluded that there were widespread problems with the accounting done under former CFO Harrison. The problems led Thor to review, among other things, the Company's LIHTC Fund accounting. According to CW2, by mid-2006 (at the time of the first restatement), Lundquist knew that the primary beneficiary determinations for most LIHTC Funds were incorrect and that the Funds should have been consolidated under FIN 46R. CW2 also asserts that Lundquist and Falcone were heavily involved in the restatement effort, with Falcone receiving "updates regarding the restatement at least on a weekly basis and sometimes on a daily basis." J.A. 82.

### iii. Confidential Witness 1

Finally, CW1 was the administrative assistant to MuniMae's head of Internal Audit, Angela Barone, from June 2004 to June 2007. In that capacity, CW1 attended regular meetings to discuss progress on ongoing audit work. According to CW1, at

19

some point, frustration with the progress of FIN 46R accounting became a regular subject of discussion at the meetings, and Barone communicated that frustration to Lundquist and Falcone.[5] CW1 recounts that Falcone sent a memo to all MuniMae employees in Fall 2006 emphasizing that the auditing staff would be focusing all of its energies on the second restatement. The memo made clear that the related audit work "should be made a priority and excuses regarding delays providing the Audit Department with information would not be tolerated." J.A. 81.

### iv. Inferences from the CW Evidence

We conclude that the confidential witness statements permit an inference that the MuniMae defendants knew, perhaps as early as mid-2006, that the Company was not in compliance with FIN 46R, despite their representations to the contrary. The allegations are also consistent with the inference that these defendants knew--or at least suspected--by Fall 2006 that consolidating the LIHTC Funds in accordance with FIN 46R would be a difficult and costly undertaking.

Nonetheless, we agree with the district court that these allegations do not support a strong inference of wrongful intent. To begin with, the confidential witnesses do not

---

[5] However, CW1 does not describe the nature of the accountants' frustration, nor is it clear precisely when these discussions took place.

20

expressly assert that the MuniMae defendants intentionally or recklessly failed to comply with GAAP or their own internal accounting policies during the class period. The statements are also generally vague and conclusory as to the MuniMae defendants' state of mind.

As even the amended complaint concedes, MuniMae struggled throughout the class period with what its own former accountant described as difficult and complex accounting. This complexity was not helped by an accounting system that was in a constant state of "'confusion and chaos,'" J.A. 85, in no small part due to the Company's rapid expansion and inadequate staffing. The MuniMae defendants may well have been negligent in failing to properly apply FIN 46R to their business in the first instance, and then by allowing the Company to be overwhelmed by the resulting accounting tsunami. But plaintiffs' allegations do not support a powerful and compelling inference that these defendants acted with wrongful intent or severe recklessness. Cf. Zucco Partners, 552 F.3d at 1007 ("Although the allegations in this case are legion . . . the facts alleged . . . point towards the conclusion that [the defendant] was simply overwhelmed with integrating a large new division into its existing business.").

That MuniMae's officers and outside auditor debated how to account for the LIHTC Funds in light of FIN 46R does not compel

21

an inference of wrongful intent. The more plausible inference is that there was an honest disagreement over the proper application of a challenging new accounting standard. That the MuniMae defendants were ultimately wrong is not enough to support an inference of scienter. Cf. DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 390 (9th Cir. 2002) ("[T]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." (quoting In re Software Toolworks, Inc., 50 F.3d 615, 627 (9th Cir. 1994))).

As for CW2's allegations regarding Lundquist's knowledge of the FIN 46R issues, they too fail to support a strong inference that she--or anyone else--acted with fraudulent purpose. Even if, as plaintiffs allege, Lundquist began to suspect a problem with the FIN 46R accounting at the time the first restatement began in March 2006, we are not persuaded that she then hatched a plot to defraud the investing public.

To the contrary, we are skeptical that Lundquist would sign off on the first restatement in June 2006 without addressing FIN 46R issues, thus subjecting herself to SEC sanctions, if she firmly believed then that the accounting was wrong. A more logical and compelling inference is that Lundquist and the other MuniMae defendants were continuing to assess the scope of the problem before deciding on an appropriate course of action. We

22

also find it significant that it was MuniMae's management--and not some outside entity--that ultimately disclosed that the Company would have to consolidate the remaining LIHTC Funds in January 2007 (thus conceding the Company's earlier error).  In our view, this disclosure supports a strong "inference that defendants were not acting with scienter but rather were endeavoring in good faith to inform [the investing public]." Matrix Capital, 576 F.3d at 189.

Finally, we recognize that the Fall 2006 Falcone memorandum, which noted that that the auditing staff intended to focus all of its energies on the second restatement, supports an inference that the MuniMae defendants could have more promptly anticipated the substantial costs of addressing the Company's myriad accounting issues.  But that is a far cry from concluding that Falcone and his fellow defendants resolved then to defraud plaintiffs by hiding the true costs.

In our view, management's subsequent disclosures tend to negate an inference of fraudulent purpose.  In July and August 2007, the Company (1) announced the hiring of an independent consultant to assist with the work of the second restatement, (2) identified the large number of personnel working on the accounting issues, and (3) expressed uncertainty as to the costs of the effort going forward.  Although these disclosures were perhaps not as timely or as fulsome as plaintiffs would have

liked, they give rise to a more compelling inference that the MuniMae defendants were attempting--even if imperfectly--to keep the investing public informed, while working strenuously to correct the accounting errors they had discovered.

### b. Red Flags

Plaintiffs contend that there were numerous red flags that should have alerted the MuniMae defendants to the FIN 46R accounting problems, and that their failure to timely identify the problems demonstrates a reckless disregard for the accuracy of the Company's financial statements. Specifically, they point to: (1) the need for and magnitude of multiple restatements, which involved revising several years' financial statements and multiple accounting problems; (2) the frequency of accounting meetings involving FIN 46R issues; (3) the high turnover of CFOs during the class period; and (4) the firing of PwC.

Additionally, plaintiffs emphasize that the individual defendants were the Company's most senior executives, and that the LIHTC Funds represented a core operation of the Company. Because these defendants were directly responsible for the Company's financial statements--and many were heavily involved in the second restatement--they must have known, or recklessly failed to realize, that the Company was not in compliance with FIN 46R.

24

The presence of "red flags," coupled with the "breadth and gravity" of a company's problems, may provide "substantial weight" to an inference that high level corporate agents "must have been aware of the problems." See Matrix Capital, 576 F.3d at 183-85. The more significant the error the stronger the inference it supports. See id. at 184-85; see also In re Atlas Worldwide Holdings, Inc. Sec. Litig., 324 F. Supp. 2d 474, 488-89 (S.D.N.Y. 2004) ("When a company is forced to restate its previously issued financial statements, the mere fact that the company had to make a large correction is some evidence of scienter.").

While the red flags alleged in the complaint are not insubstantial, they do not give rise to a strong inference of scienter. Fundamentally, the FIN 46R accounting error itself was not especially obvious, at least with respect to the Company's financial bottom-line. In that regard, we note, as did the district court, that MuniMae's ownership interest in the unconsolidated LIHTC Funds was one percent or less. The cumulative economic impact of all of the restatement adjustments--including but not limited to the LIHTC Fund consolidation--was a loss of approximately $44.9 million in

shareholders' equity for fiscal year 2005.[6]  For the same year, MuniMae's adjusted shareholders' equity was approximately $723 million.  Thus, while the effort to complete the restatement proved costly, the practical effect of proper consolidation on the Company's financial statements was relatively small.

The other potential warning signs also lend themselves to benign interpretations.  We view the frequency of accounting meetings as a sign of diligence rather than evidence of a nefarious purpose.  Cf. Zucco Partners, 552 F.3d at 1000 (noting that an allegation that top executives attended several meetings to discuss the company's financial affairs was not the kind of particular evidence required to support a strong inference of scienter).

A high turnover in CFOs can certainly raise suspicion, but the facts alleged here mitigate any concern.  Harrison left the Company in late 2005, well before any officer is alleged to have known about the FIN 46R issues.  Lundquist resigned in July 2007, after the Company was required to perform two restatements under her watch, the second of which entailed numerous delays and snowballing costs.  While Lundquist's resignation is

---

[6] The loss in shareholders' equity specifically attributable to consolidating the LIHTC Funds was $78.3 million, but gains in other areas as a result of the restatement reduced the overall impact of consolidation on the Company's financial bottom-line.

evidence of the substantial accounting challenges the Company then faced, it does not compel an inference that she and the other individual defendants were bent on committing fraud. See id. at 1002 ("Where a resignation occurs slightly before or after the defendant corporation issues a restatement, a plaintiff must plead facts refuting the reasonable assumption that the resignation occurred as a result of [the] restatement's issuance itself in order for a resignation to be strongly indicative of scienter.").

Nor is PwC's October 2006 departure particularly telling. The dismissal of an accounting firm around the time of a restatement is not surprising. Cf. id. (concluding that the resignation of the defendant's independent public accountant did not support a strong inference of scienter because the firm "had just been partially responsible for the corporation's failure to adequately control its accounting procedures"). This is especially true on these facts, as MuniMae was required to execute two restatements while PwC was serving as its auditor. The fact that PwC alerted the Company to one of the many issues the restatements ultimately addressed does not mean that the MuniMae defendants were not justifiably dissatisfied with PwC's services generally. Any inference of wrongful intent is further weakened by the fact that PwC made clear in a letter to the SEC that it had no disagreements with the Company on any matter of

27

accounting principle or practice that it felt obligated to report.[7]

Finally, and in accordance with several of our sister circuits, we reject plaintiffs' contention that the individual defendants must have acted intentionally or recklessly with respect to the FIN 46R accounting merely because (1) they were senior executives, and (2) the LIHTC Funds represented a core business of the Company. See, e.g., In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 282 (3d Cir. 2006) ("A pleading of scienter . . . may not rest on a bare inference that a defendant must have had knowledge of the facts or must have known of the fraud given his or her position in the company." (internal quotation marks omitted)), abrogated on other grounds by Tellabs, 551 U.S. at 322-23; Zucco Partners, 552 F.3d at 1000 (finding that "bare allegations" that officers must have have had knowledge of key facts relating to the business's "core operations" are rarely enough to support a strong inference of scienter). To be sure, such allegations are relevant to the court's holistic analysis of scienter. But without additional

---

[7] SEC regulations required MuniMae to file a statement disclosing information about its dismissal of PwC as its independent public accountant. See 17 C.F.R. § 229.304(a)(1)-(2). The regulations also required PwC to file a letter stating whether MuniMae's disclosures regarding the circumstances of its dismissal were true. See id. § 229.304(a)(3).

28

detailed allegations establishing the defendants' actual exposure to the accounting problem, the complaint falls short of of the PSLRA's particularity requirements.

### c. Insider Trading

Plaintiffs also say that Company insiders were motivated to conceal MuniMae's accounting problems to improperly benefit from insider trading. Allegations of "personal financial gain may weigh heavily in favor of a scienter inference." Tellabs, 551 U.S. at 325. However, the inferential weight that may be attributed to any claim of motive must be evaluated in context. See id. at 324. Insider trading allegations will only support an inference of scienter "if the timing and amount of a defendant's trading were unusual or suspicious." Teachers' Ret., 477 F.3d at 184 (internal quotation marks omitted). To determine whether an insider's sales were "unusual in scope" we consider factors such as "the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved." In re Suprema Specialties, 438 F.3d at 277 (internal quotation marks omitted).

In this case, the overall value of MuniMae shares sold during the class period was higher than in previous years. Six Company insiders sold 470,210 shares for a total of $12,004,901 in gross proceeds during the class period, as compared to the sale of 298,002 shares and $7,139,835 in gross proceeds between

29

June 1998 and the beginning of the class period. These numbers are certainly consistent with an inference that the insiders who traded during the class period had a motive to commit fraud.

Nonetheless, the inference that the trades were innocent is stronger. The number of insiders who traded during the class period is relatively small, and plaintiffs do not allege that the insiders timed the sales to take advantage of any particular disclosure. Cf. Teachers' Ret., 477 F.3d at 184 (finding deficient a complaint that, among other things, failed to "allege that defendants timed their sales to profit from any particular disclosures").

Nor is the extent of any insiders' divestiture particularly alarming. Former CFO Harrison sold 78% of his shares in early December 2004, but that was well before plaintiffs say that any officer of the Company knew that the FIN 46R accounting was flawed. Board Chairman Mark Joseph sold approximately 37% of his shares between late April 2005 and early June 2006. Some of these sales coincided with the lead-up to the Company's announcement of the first restatement. However, the sales occurred at fairly regular intervals and amounts compared to earlier periods. CEO Falcone sold just over 28% of his holdings during the class period, with the bulk of the sales occurring in 2004 and mid-2005. Falcone sold shares twice in early 2006, but the volume of the trades was not unusual. In short, none of the

defendants' trading strikes us as suspicious.  Cf. id. at 185 (finding insider sales of 92%, 100%, and 82% of defendants' holdings "unremarkable" in context).

The fact that Falcone and Joseph traded MuniMae shares under non-discretionary Rule 10b5-1 plans further weakens any inference of fraudulent purpose.  Under Rule 10b5-1, corporate insiders can set up trading plans to sell company shares at predetermined times and amounts to avoid accusations of illegal insider trading.  See 17 C.F.R. § 240.10b5-1(c) (stating that it is an affirmative defense in insider trading cases that the defendant's purchases or sales were made pursuant to a "written plan for trading securities"); see also Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc., 497 F.3d 546, 554 n.4 (5th Cir. 2007) (explaining that a 10b5-1 trading plan can give rise to an inference that the sales were not suspicious); In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1427-28 (9th Cir. 1994) (same).

Joseph's Rule 10b5-1 plan does less to shield him from suspicion because he instituted the plan in March 2005, after the start of the class period.  By contrast, Falcone created his plan in 2003.  Nonetheless, Joseph entered the plan a year before the complaint alleges that any officer at MuniMae knew the FIN 46R accounting was wrong, and the amended complaint does not allege that Joseph traded outside of the plan.  Thus,

31

although the Rule 10b5-1 plan does not completely immunize Joseph from suspicion, it does mitigate any inference of improper motive surrounding his sales.

An additional problem with the allegations of insider trading relates to the length of the putative class period. The plaintiffs have chosen an inordinately long period of 44 months. See Teachers' Ret., 477 F.3d at 185 (describing a 46-month class period as "exceedingly long"); see also In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1092 (9th Cir. 2002) (characterizing a class period of 15 months as "unusually long"), abrogation on other grounds recognized by South Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 784 (9th Cir. 2008). In our view, alleging such a lengthy class period makes it difficult to infer intent from the mere fact of a stock sale, as it is not unusual for insiders to trade at some point during their tenure with a company. See Teachers' Ret., 477 F.3d at 185.

### d. Other Allegations of Motive

Plaintiffs proffer a number of general business motivations from which they would have us infer fraud. They contend that MuniMae wanted to artificially inflate the price of its shares to attract investors, fund corporate acquisitions, avoid a default on loan covenants, and obtain favorable loan terms. We decline, however, to infer fraud from financial motivations common to every company. See Ottmann v. Hanger Orthopedic Grp.,

32

Inc., 353 F.3d 338, 352 (4th Cir. 2003) ("[C]ourts have repeatedly rejected these types of generalized motives--which are shared by all companies--as insufficient to plead scienter under the PSLRA.").

Although MuniMae conducted numerous offerings and acquisitions during the class period, very little of this activity occurred after any officer is alleged to have known that the FIN 46R accounting was flawed. It is true that the Company was aware that consolidating LIHTC Funds could affect its debt covenants, as the initial consolidation in 2004 would have caused it to default on at least two debt covenants. But MuniMae disclosed that fact, and it was also able to negotiate waivers on each covenant to avoid default. In short, nothing about the specific facts alleged render MuniMae's general business motivations particularly suspicious.

e. Class Period Disclosures

For their part, the MuniMae defendants assert that their class period disclosures rebut any inference of scienter. "It is appropriate to consider such disclosures, which in some contexts will indicate that the defendants were acting in good faith, but in other contexts will indicate that the defendants had knowledge of operational risks (suggesting a lack of good faith)." Matrix Capital, 576 F.3d at 185.

33

We believe MuniMae made several relevant disclosures during the class period.  In announcing its first restatement on March 10, 2006, MuniMae also alerted investors to the fact that the Company suffered from "material weaknesses related to the financial reporting process."  J.A. 821.  Although only a few material weaknesses were then identified, the Company warned that management might "identify additional material weaknesses" as part of the restatement.  Id.

Over the next two years, the Company repeatedly disclosed newly discovered material weaknesses, and reiterated that it might identify additional problems that would render its remedial efforts ineffective.  The fact that MuniMae continued to update investors about newly discovered weaknesses tends to negate an inference that the defendants acted with an intent to defraud.  Cf. Matrix Capital, 187 F.3d at 187 ("A disclosure that meaningfully alerts investors to the risk that financial information is not accurate may suggest that the individuals responsible for the disclosure did not knowingly (or perhaps not even recklessly) misstate the underlying financial information.").

MuniMae also attempted to update investors regarding the escalating cost of the second restatement.  Although the initial announcement in September 2006 identified only a few areas for restatement, the Company announced in October that it had not

34

yet determined its full scope. In May 2007, the Company disclosed that it was unable to timely file its annual Form 10-K for fiscal year 2006 because of the "dedication of significant management resources to these restatement efforts." J.A. 1129. On July 10, 2007, the Company announced that it had retained Navigant Consulting to assist in the restatement efforts. In a telephone conference with investors the following month, the Company noted that, given the scope of the restatement, it had to "bring new and unbudgeted resources online quickly." J.A. 1145. Finally, at a November 8 teleconference, the Company informed investors that both the magnitude and cost of the restatement would be "very significant." J.A. 1157.

To be sure, the import of some of MuniMae's disclosures was moderated by the fact that it occasionally buried the information in press releases headlined with favorable news. Nonetheless, MuniMae repeatedly noted the need to restate its financials, the deficiency in its internal controls, and the fact that the restatement would require the Company to commit resources far greater than initially anticipated.

Not only do these disclosures bolster the inference that the MuniMae defendants acted in good faith, but they also strengthen the inference that these defendants only realized the FIN 46R accounting problems--and the cost of fixing them--over time.

35

2.

After evaluating the inferential weight owed to plaintiffs' allegations of corporate fraud in light of context and common sense, we must consider "whether a reasonable person would regard the inference that defendants knowingly or recklessly misstated or omitted material information at least as strong as the inference that [the MuniMae defendants] were merely negligent with respect to those statements." Matrix Capital, 576 F.3d at 187. To that end, we must evaluate the complaint holistically, recognizing that "allegations of scienter that would not independently create a strong inference of scienter might compliment [sic] each other to create an inference of sufficient strength to satisfy the PSLRA." Id. at 187-88.

Considered holistically, we conclude that plaintiffs have not satisfied their burden under the PSLRA. We accept as fact that management regularly discussed FIN 46R compliance issues, even before the first restatement, and that by mid-2006, at least Lundquist had determined that the Company's LIHTC Fund accounting was flawed. We know that PwC recommended that the Company reconsider its LIHTC Fund accounting prior to the first restatement, but that at least some MuniMae officers disagreed. We acknowledge that in the fall of 2006, the Company recognized that correcting various accounting errors would be a management focus for some time. We accept that the MuniMae defendants had

36

financial motivations--albeit universal ones--to avoid disclosing the need to consolidate the LIHTC Funds. And we know that MuniMae suffered from material weaknesses in its internal controls that, among other things, could have alerted management to problems with the FIN 46R accounting.

While this mosaic supports an inference of scienter, we find more compelling the inference that the MuniMae defendants were, at most, negligent. In 2004, MuniMae was faced with applying a challenging new accounting standard to its rapidly expanding business, requiring the Company to determine whether and how to consolidate a number of LIHTC Funds that previously were not on the Company's financial statements. MuniMae's management mistakenly--and perhaps negligently--failed to have sufficient accounting controls and processes in place to meet this challenge, which, together with other accounting errors over the course of 2004 and 2005, required the Company to twice restate its financial accounting statements at a substantial cost. In our view, the facts alleged point more convincingly to an inference that MuniMae was simply in over its head.

Although some officers may have believed that MuniMae's accounting was flawed by mid-2006, the evidence suggests that others, at least initially, disagreed. This makes it difficult to infer that the MuniMae defendants intentionally, or even recklessly, misrepresented the state of the Company's financial

37

affairs.  See Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1069 (9th Cir. 2008) (finding insufficient allegations that "point only to disagreement and questioning" within the Company about a particular accounting practice).  And even if some senior officers had concluded by mid-2006 that the FIN 46R accounting was wrong, that does not establish that they acted with fraudulent purpose to conceal the problems until January 2007.

The strength of the inference with respect to MuniMae's knowledge of the costs of the second restatement is even weaker on the facts alleged.  We think it more plausible that the Company simply had not reached a conclusion with respect to FIN 46R until after it began the second restatement, and that the MuniMae defendants only gradually became aware of the expense as it was incurred.

The Company's successive disclosures suggest that its officers attempted to keep investors updated about MuniMae's internal weaknesses.  The pattern of disclosures also suggests that management only gradually awakened to the magnitude of the Company's accounting problems and the cost of fixing them.  That the Company's accounting department during the early part of the class period was chronically understaffed and, at least initially, professionally unprepared for the accounting challenge before it, strengthens the inference that final

38

decisions regarding the FIN 46R accounting remained unresolved until late 2006.

On the facts alleged, the inference that the MuniMae defendants were negligent in discharging their duties may well be compelling. But that is not enough to survive a motion to dismiss in this context. See Pub. Emps.' Ret., 551 F.3d at 313. We hold that the district court correctly dismissed plaintiffs claims under the PSLRA for failing to adequately plead scienter.[8]

## III.

We turn next to plaintiffs' Securities Act claims. The "basic purpose" of the Securities Act of 1933 is "to provide greater protection to purchasers of registered securities." Herman & MacLean v. Huddleston, 459 U.S. 375, 383 (1983). Sections 11 and 12(a)(2) prohibit the use of materially false or misleading statements or omissions in registration statements and prospectuses, respectively. See 15 U.S.C. § 77k(a); 77l(a)(2). In contrast to Exchange Act requirements, "scienter

_____

[8] The district court also dismissed the plaintiffs' claims against the MuniMae officers under § 20(a) of the Exchange Act. That provision imposes liability on each person who "controls any person liable under any provision of this chapter or of any rule or regulation thereunder." 15 U.S.C. § 78t(a). Section 20(a) liability is derivative of § 10(b). Because the complaint is legally insufficient with respect to the § 10(b) claim, the § 20(a) claim must also fail. See, e.g., Matrix Capital, 576 F.3d at 192.

39

is not an element of a violation" of either section.  Newcome v. Esrey, 862 F.2d 1099, 1106 (4th Cir. 1988) (en banc).

The amended complaint alleges that certain defendants[9] violated §§ 11 and 12(a)(2) because the registration statement and prospectus for the 2005 SPO incorporated by reference materially misleading statements and omissions.  For example, the registration statement incorporated by reference the Company's quarterly reports from the second and third quarters of 2004, which represented that MuniMae was in compliance with FIN 46R.  See J.A. 1461.  The February 2, 2005, prospectus supplement expressly represented that MuniMae was in compliance with FIN 46R.  However, it also noted that "[d]ue to the complexity of FIN 46R . . . we cannot assure you that further changes in our financial statements will not be required with respect to the application of FIN 46R."  J.A. 1578.

The district court found the § 11 claim time-barred by the Securities Act's statute of repose and dismissed the § 12(a)(2) claim for lack of standing.  We address each issue in turn.

---

[9]  The § 11 SPO claim is brought against the MuniMae defendants and the underwriter defendants.  The § 12(a)(2) claims is alleged against the Company and the underwriter defendants.

40

A.

1.

Section 13 of the Securities Act contains a three-year statute of repose.  See 15 U.S.C. § 77m.  It provides:

> In no event shall any such action be brought to enforce a liability created under [§ 11 or § 12(a)(1)] of this title more than three years after the security was bona fide offered to the public . . . .

15 U.S.C. § 77m.

The statute does not define the term "bona fide offered to the public," and neither the Supreme Court nor this circuit has determined the meaning of the phrase.  The district court applied the rule accepted by the majority of courts and found that the statute of repose began to run on the date the SEC declared MuniMae's registration statement effective, i.e., January 14, 2005.  Because the original complaint in this action was not filed until February 1, 2008, the court concluded that the § 11 claim was two-weeks late.  See In re Mun. Mortg. & Equity, 576 F.2d at 655-57.

On appeal, plaintiffs' arguments are threefold.  First, applying a combination of dictionary and statutory definitions, they say that a bona fide offering occurs only when securities are offered "for value" in a manner capable of acceptance, and in a way that is open and visible.  Under this interpretation, the repose period began to run, at the earliest, on February 2,

41

2005, that is, when MuniMae issued a prospectus supplement pricing the securities, or on February 3, when the SPO commenced. Alternatively, plaintiffs suggest the securities were not bona fide offered until February 8, the last date of the SPO. Finally, plaintiffs argue that, even if the general rule is that the statute of repose begins to run on the effective date of the registration statement, we should not apply that rule in this case because there was a significant delay between the effective date and the commencement of the offering.

Both the MuniMae and underwriter defendants respond that the effective date of the SPO registration statement constituted the bona fide offering date because it is the date on which all barriers to sale were removed. They also emphasize that most case law defines the effective date of the registration statement as the bona fide offering.

2.

The meaning of "bona fide offered to the public" in § 13's statute of repose is a question of statutory interpretation that we review de novo. See P. Stolz Family P'ship L.P. v. Daum, 355 F.3d 92, 98 (2d Cir. 2004).

We begin by considering whether the language at issue has a plain and unambiguous meaning. See United States v. Ashford, 718 F.3d 377, 382 (4th Cir. 2013). At first blush, the

42

plaintiffs' principal position is appealing.  In ordinary usage, "bona fide" often means (as plaintiffs urge) "genuine."  <u>See</u> <u>Random House Webster's Unabridged Dictionary</u> 237 (2d ed. 2001); <u>see also</u> <u>Black's Law Dictionary</u> 199 (9th ed. 2009) ("Sincere; genuine").  But it can also mean "made . . . in good faith" and "without deception or fraud."  <u>Random House Webster's Unabridged Dictionary</u> 237; <u>see also</u> <u>Black's Law Dictionary</u> 199 ("Made in good faith; without fraud or deceit").  To the extent other courts and authorities have considered the meaning of "bona fide" in context, they have concluded that Congress simply intended to distinguish a true offering from a "simulated offering."  <u>See</u> <u>P. Stolz</u>, 355 F.3d at 99; <u>see also</u> 1 Louis Loss, Joel Seligman & Troy Paredes, <u>Securities Regulation</u> § 2-B-6(g)(i), at 773 & n.355 (4th ed. 2006) (discussing the dealer exemption under § 4(3)(A) of the Securities Act, which also uses the term "bona fide offered to the public").

The meaning of the word "offer" is no more certain.  As commonly used, "offer" can mean both "to present for acceptance or rejection" and also to "propose or put forward for consideration."  <u>See</u> <u>Random House Webster's Unabridged Dictionary</u> 1344.  Section 2(a)(3) of the Securities Act defines "offer" to "include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value."  15 U.S.C. § 77b(a)(3).  But we think it

43

unlikely that Congress intended the meaning of "bona fide offered" in § 13 to be coterminous with the definition of "offer" in § 2(a)(3). See Morse v. Peat, Marwick, Mitchell & Co., 445 F. Supp. 619, 622 (S.D.N.Y 1977) ("The term 'bona fide offered to the public' is a term of art and one not necessarily synonymous with the full breadth of the statutory term 'offer.'").

Because we believe the statutory language is susceptible to more than one meaning, we look beyond the statute for guidance. The Second Circuit's opinion in P. Stolz is the leading authority on the term "bona fide offered to the public" in § 13. The question in that case was the meaning of that phrase in the context of unregistered securities. But the court examined a number of cases involving registered securities and determined that "the date of registration has been treated as the date that starts the running of the repose period." P. Stolz, 355 F.3d at 99.

A majority of courts have followed the P. Stolz guidance, see, e.g., Armstrong v. Am. Pallet Leasing Inc., 678 F. Supp. 2d 827, 868 (N.D. Iowa 2009); In re Metro. Sec. Litig., 2010 WL 537740, at *1 (E.D. Wash. Feb. 8, 2010); In re Countrywide Fin. Corp. Sec. Litig., 2009 WL 943271, at *6 (C.D. Cal. Apr. 6, 2009), and we agree that this approach best reflects congressional purpose. Section 11 is violated when a

registration statement containing misleading information becomes effective. See 15 U.S.C. § 77k(a); 17 J. William Hicks, Civil Liabilities: Enforcement & Litigation Under the 1933 Act § 4:57 (2013). Using the effective date of the registration statement as the bona fide offering date logically links a putative defendant's liability to the statutory violation. See Fed. Hous. Fin. Agency v. UBS Ams., Inc., 2012 WL 2400263, at *2 (S.D.N.Y. June 26, 2012) (recognizing that courts have accepted the effective date as the repose trigger on the ground that "the registration statement includes the information upon which the Section 11 claim is predicated--the alleged falsehood").

Using the effective date is also consistent with the purpose of statutes of repose generally. Such statutes provide "a fixed date readily determinable by the defendant . . . rather than a date determined by the personal circumstances of the plaintiff." Caviness v. Derand Res. Corp., 983 F.2d 1295, 1300 n.7 (4th Cir. 1993); see also City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc., 637 F.3d 169, 176 (2d Cir. 2011) (contrasting a statute of repose, which "begins to run from the defendant's violation," with a statute of limitations, which "cannot begin to run until the plaintiff's claim has accrued").[10]

---

[10] Although we do not rely on the legislative history, we note that it is not inconsistent with our conclusion. In 1954, Congress amended numerous provisions of the federal securities (Continued)

Plaintiffs object to this view of the statute, pointing to § 4(3) of the Securities Act, which also uses the term "bona fide offered to the public." See 15 U.S.C. § 77d(a)(3)(B). That provision exempts certain dealer transactions from the prospectus delivery requirement, and it applies "prior to the expiration of forty days after the effective date of such registration statement or prior to the expiration of forty days after the first date upon which the security was bona fide offered to the public." See id. (emphasis added). Plaintiffs say that this language demonstrates that "the date on which a security is 'bona fide offered to the public' can be entirely distinct from the date on which a registration statement is declared effective." Appellants' Br. at 24.

---

laws, including the Investment Company Act of 1940. See Act of August 10, 1954, ch. 667, tit. IV, § 402, 68 Stat. 683, 689 (codified as amended at 15 U.S.C. § 80a-24). Congress amended the Investment Company Act, 15 U.S.C. § 80a-1 et seq., among other things, to permit investment companies engaged in continuous offerings to file amendments to existing registration statements instead of filing a new one. See S. Rep. No. 83-1037, at 21 (1954).

Both the House and Senate Reports accompanying the amendments equate the effective date of the registration statement with the bona fide offering. See H.R. Rep. No. 83-1542, at 30 (1954) ("[A] dealer . . . need not use a prospectus in connection with a transaction in a security after the expiration of 1 year from the first date on which the security was bona fide offered to the public, which, in most cases, means approximately 1 year after the effective date of the registration statement."); S. Rep. No. 83-1037, at 20 (same).

But the fact that a different section of the statute provides that the bona fide offer and registration <u>can</u> be distinct events does not inexorably mean that they always will be. <u>Cf.</u> <u>In re Lehman Bros. Sec. & ERISA Litig.</u>, 903 F. Supp. 2d 152, 171 (S.D.N.Y. 2012) ("To be sure, the phrase bona fide offered to the public, recognizes that there will be circumstances in which stock covered by an effective registration statement has not genuinely been offered to the public, in which case the commencement of the repose period may begin later than the effective date of the registration statement." (internal quotation marks omitted)).

In "the vast majority of offerings" the bona fide offering to the public "will be the effective date of the registration statement." 17 Hicks, <u>Civil Liabilities</u> § 4:77. The only exceptions would arise in the context of delayed or continuous offerings in which information that is fundamental to assessing the value of a particular offering is not disclosed until after the registration statement becomes effective. <u>See id.</u>; <u>see also</u> <u>UBS Ams., Inc.</u>, 2012 WL 2400263, at *2.[11]

---

[11] At the time of the 2005 SPO, the SEC did not consider the pricing information MuniMae filed in its prospectus supplement the kind of fundamental information that would merit exceptional treatment. <u>See</u> 17 C.F.R. § 229.512(a)(1)(2004); <u>In re Lehman Bros. Sec. & ERISA Litig.</u>, 903 F. Supp. 2d at 171.

47

Plaintiffs argue nonetheless that we should not accept registration as the triggering event here, even if, as a general rule, the two coincide. They say that using the effective date of the registration statement is only appropriate in cases where there is virtually no delay between registration and the commencement of the public offering. By contrast, the 2005 SPO was a shelf offering, and there was a two-week delay between the effective date and the commencement of the offering. MuniMae did not file a prospectus supplement announcing that the registration statement was effective until February 1, and it only priced the securities on February 2. On these facts, plaintiffs argue, the securities were not genuinely offered to the public on January 14.

We disagree. The general rule that the statute of repose begins to run on the effective date has been repeatedly applied in the context of delayed offerings. See, e.g., In re Adelphia Commc'ns Corp. Sec. & Derivative Litig., 2005 WL 1679540, at *6 (S.D.N.Y. July 18, 2005) ("Even where registered securities are offered pursuant to a less typical delayed offering, the limitations period runs from the date of either the registration statement or the [post-effective] amendment . . . ."), adhered to on reconsideration, 2005 WL 1882281 (S.D.N.Y. Aug. 9, 2005); see also UBS Ams., Inc., 2012 WL 2400263, at *2-3 (recognizing that that the general rule will apply in shelf offerings when

48

the registration statement contains the misleading information on which the § 11 claim is predicated).

This is not the unusual case in which a post-effective disclosure--rather than the registration statement--contained the allegedly false or misleading information. The amended complaint directly avers that the registration statement declared effective on January 14 contained or incorporated by reference the misleading statements to which plaintiffs object.[12] Under these circumstances, we are comfortable concluding that MuniMae's exposure began on the effective date.

The two-week gap between the effective date and the commencement of the SPO does not alter our analysis. The fact that plaintiffs did not know that the registration statement was effective as of January 14 is of no consequence for statute of repose purposes. See Caviness, 983 F.2d at 1300 ("[Section] 13 allows for no qualification emanating from the claimant's circumstances."); see also P. Stolz, 355 F.3d at 102-03 (explaining that a statute of repose begins to run "even if the plaintiff has not yet, or could not yet have, discovered that she has a cause of action"). Moreover, the SEC has sanctioned a

---

[12] By contrast, the prospectus supplement filed on February 2, which priced the securities, contained a rather unambiguous warning that MuniMae's FIN 46R accounting might be incorrect. See J.A. 1578.

delay of up to fifteen business days between registration and the commencement of sale in the context of non-delayed offerings. See 17 C.F.R. §§ 230.430A(a)(3), 229.512(a). Thus, the thirteen-day gap here hardly strikes us as abusive.

In sum, we hold that securities will generally be bona fide offered to the public on the date the SEC declares the registration statement effective. Applying this holding, we conclude that MuniMae bona fide offered securities to the public on January 14, 2005. Plaintiffs' amended complaint, which relates back to the original complaint filed on February 1, 2008, is thus time-barred under § 13's statute of repose.

B.

1.

We turn finally to the amended complaint's § 12(a)(2) claim against MuniMae and the underwriter defendants with respect to the 2005 SPO. Section 12(a)(2) provides that any person who "offers or sells a security . . . by means of a prospectus or oral communication" containing a materially false statement or material omission "shall be liable . . . to the person purchasing such security from him." 15 U.S.C. § 77*l*(a)(2).

The amended complaint alleges that named plaintiff Dammeyer "purchased MuniMae's common stock pursuant and/or traceable to the SPO Registration Statement and Prospectus dated February 2, 2005." J.A. 89. It incorporates by reference Dammeyer's

50

confirmation slip for the shares.  The slip shows that Dammeyer purchased 600 shares of MuniMae stock at $26.32 per share on February 3, 2005, and that he received those shares on February 8, 2005.  The slip also bears the logo of RBC Dain Rauscher and includes the phrase "PROS UNDER SEP COVER."  J.A. 1606.

The district court found the amended complaint and confirmation slip insufficient to establish Dammeyer's standing.  It found Dammeyer's claim that he purchased stock "pursuant and/or traceable to" the SPO documents conclusory, and the confirmation slip lacking in "supporting details to make a plausible claim that Dammeyer purchased directly in the SPO." In re Mun. Mortg. & Equity, LLC, 876 F. Supp. 2d at 660.

On appeal, plaintiffs contend that the district court improperly failed to consider the confirmation slip referenced in the complaint, and that the slip, when properly considered, supplies the necessary details to support a plausible allegation of standing.  Defendants respond that Dammeyer would have said that he purchased his shares directly in the SPO if he actually did.  Moreover, they claim that the details of the confirmation slip show that Dammeyer purchased his securities on the secondary market and not in the SPO.

2.

We review the plausibility of the amended complaint's standing allegations de novo under the pleading requirements of

51

Rule 8(a). See In re Century Aluminum Co. Sec. Litig., 729 F.3d 1104, 1107-09 (9th Cir. 2013) (reviewing the plausibility of a complaint's standing allegations with respect to a § 11 claim). It is not enough for the amended complaint to allege facts, which, accepted as true, are merely consistent with the possibility that Dammeyer purchased shares in the SPO; the allegations must also render such a conclusion plausible. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

To establish standing under § 12(a)(2), a plaintiff must allege that he purchased shares from "[a]ny person" who "offer[ed] or s[old] a security . . . by means of a prospectus." 15 U.S.C. § 77l(a)(2). In Gustafson v. Alloyd Co., 513 U.S. 561 (1995), the Supreme Court interpreted the prospectus requirement of § 12(a)(2), and concluded that, because "prospectus" is a term of art referring to a specific document in a public offering, sales made pursuant to private contracts are not made by means of a prospectus. See id. at 580-84. Thus, § 12(a)(2) liability is "limited to public offerings," and purchasers in the secondary market may not sue. Id. at 578; see also In re CitiGroup Inc. Bond Litig., 723 F. Supp. 2d 568, 585 (S.D.N.Y. 2010) ("[A] plaintiff seeking redress pursuant to Section 12(a)(2) must establish that it purchased the security directly from defendants through the public offering at issue.").

A number of district courts have concluded that the "pursuant and/or traceable to" language employed in the amended complaint is insufficient to establish standing for § 12(a)(2) purposes. See, e.g., Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., 714 F. Supp. 2d 475, 484 (S.D.N.Y. 2010); In re Wells Fargo Mortg.-Backed Certificate Litig., 712 F. Supp. 2d 958, 966 (N.D. Cal. 2010); In re Sterling Foster & Co., Inc., Sec. Litig., 222 F. Supp. 2d 216, 245-46 (E.D.N.Y. 2002). The general tenor of these opinions is that plaintiffs should plead that they directly purchased securities in the relevant offering, and that a failure to do so implies that the securities were in fact purchased on the secondary market. See, e.g., In re Sterling Foster, 222 F. Supp. 2d at 245.

The First Circuit has held that alleging that a plaintiff purchased securities "pursuant and/or traceable to" a public offering can be sufficient if coupled with additional supportive facts. See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762, 776 (1st Cir. 2011) (finding the terminology sufficient when coupled with allegations that plaintiffs "'acquired'" securities "'from'" the defendants and that the defendants "'promoted and sold'" the securities to the plaintiffs).

We agree that using the "pursuant and/or traceable to" language--coupled with sufficient supporting facts--can give

rise to a plausible inference of standing in certain circumstances. Here, however, we find the amended complaint and confirmation slip insufficient to make plaintiffs' allegations of standing plausible. Though not dispositive, the plaintiffs' coy choice of words gives us some pause. And we do not find the additional supporting facts sufficient to push the claim into the realm of plausibility.

To be sure, the amended complaint alleges a number of facts consistent with the possibility that Dammeyer purchased his shares directly in the SPO. For example, the complaint alleges that Dammeyer purchased 600 common shares of MuniMae stock on February 3, 2005, and, according to the amended complaint, the SPO occurred "[o]n or about February 2, 2005," J.A. 233. Although these dates of purchase are close, they do not directly coincide.

More helpful to plaintiffs, the confirmation slip shows that the settlement date for Dammeyer's securities was February 8, see J.A. 1606, which coincides with the date the prospectus supplement states that SPO shares would be available for delivery, see J.A. 1557. These supporting facts are not irrelevant, but they are also not sufficient. Cf. In re Century Aluminum, 729 F.3d at 1107-08 (finding similar evidence about pricing and sale dates insufficient in the context of § 11, where standing requirements are more relaxed).

54

Plaintiffs emphasize the fact that the confirmation slip bears the notation "PROS UNDER SEP COVER," which means prospectus under separate cover. See J.A. 1606; see also Gustafson, 513 U.S. at 571 ("[T]he liability imposed by [§ 12(a)(2)] cannot attach unless there is an obligation to distribute the prospectus . . . ."). However, as defendants note, RBC is both a registered broker-dealer and an underwriter, and under SEC regulations, it may have had to deliver a prospectus to Dammeyer in either capacity. See 15 U.S.C. §§ 77d(a)(3), 77e(b) (prospectus delivery requirement); 17 C.F.R. § 230.174 (obligations of broker-dealers to comply with prospectus delivery requirements). Without more, that notation is merely consistent with the claim that Dammeyer purchased his shares directly in the SPO.[13]

The plausibility of the claim against the underwriter defendants is even weaker. The confirmation slip provides no support for the contention that Dammeyer purchased his shares from Merrill Lynch. With respect to RBC, the allegations are not much better. The attached confirmation slip bears the logo

---

[13] We also note that the complaint alleges that the SPO offered shares "priced at $26.51." J.A. 111. But Dammeyer's purchase price was $26.32 per share. J.A. 1606. And, in contrast to Plumbers' Union, there are no allegations that defendants specifically promoted the securities or solicited Dammeyer's purchase.

55

of "RBC Dain Rauscher." However, RBC Capital Markets Corp. was the designated underwriter for the SPO. See J.A. 1590. Dammeyer does not allege that these were the same entity as of 2005, or that they should be treated as such for liability purposes.

At best, the allegations are merely consistent with the possibility that Dammeyer purchased his securities in the SPO. The "pursuant and/or traceable to" language of the complaint is conclusory, and the confirmation slip does not provide sufficient "factual enhancement" to support a "reasonable inference that the defendant[s are] liable for the misconduct alleged." See Iqbal, 556 U.S. at 678 (internal quotation marks omitted). In this circumstance, the complaint "stops short of the line between possibility and plausibility." See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556 (2007). Accordingly, we agree with the district court that Dammeyer did not adequately allege standing to bring a § 12(a)(2) claim.[14]

---

[14] Dammeyer also brings an SPO-based claim under § 15 of the Securities Act, which imposes derivative liability on certain "control persons" for primary violations of the Act. See 15 U.S.C. § 77o. We dismiss the § 15 claim because the complaint fails to state a claim under the predicate Securities Act provisions. See Greenhouse v. MCG Capital Corp., 392 F.3d 650, 656 n.7 (4th Cir. 2004).

IV.

For the foregoing reasons, we affirm the judgment of the district court.

<u>AFFIRMED</u>