PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2200
_____

In re:  HERTZ GLOBAL HOLDINGS INC


SHEET METAL WORKERS LOCAL UNION 80 PENSION
TRUST FUND;
WESTCHESTER TEAMSTERS PENSION FUND,
Appellants
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-13-cv-07050)
District Judge:  Hon. Madeline C. Arleo
_____

Argued
June 12, 2018

Before:   AMBRO, JORDAN, and HARDIMAN, *Circuit
Judges*

(Filed September 20, 2018)

Evan J. Kaufman
Samuel H. Rudman
Robbins Geller Rudman & Dowd
58 S. Service Rd. – Ste. 200
Melville, NY 11747

Douglas S. Wilens [ARGUED]
Robbins Geller Rudman & Dowd
120 E. Palmetto Park Rd. – Ste. 500
Boca Raton, FL 33432

Peter S. Pearlman
Cohn Lifland Pearlman Hermann & Knopf
Park 80 West – Plaza One
250 Pehle Ave. – Ste. 401
Saddle Brook, NJ 07663
 *Counsel for Appellants Sheet Metal Workers*
 *Local 80 Pension Trust Fund, and Westchester*
 *Teamsters Pension Fund*

Ross B. Bricker
Howard S. Suskin
Jenner & Block
353 N. Clark St. – Ste. 4500
Chicago, IL 60654

Adam G. Unikowsky [ARGUED]
Jenner & Block
1099 New York Avenue – Ste. 900
Washington, DC 20001
 *Counsel for Appellee*
 *Hertz Global Holdings Inc.*

2

Kevin H. Marino
John D. Tortorella
Marino, Tortorella & Boyle
437 Southern Blvd.
Chatham, NJ 07928
    *Counsel for Appellees*
    *Hertz Global Holdings Inc.*
    *and Elyse Douglas*

David A. Kotler
Dechert
100 Overlook Center – 2nd Fl.
Princeton, NJ 08540

Andrew J. Levander
Dechert
1095 Avenue of the Americas
New York, NY 10036
    *Counsel for Appellee*
    *Mark P. Frissora*

Elliott Greenfield
Maeve L. O'Connor
Edwin G. Schallert
Debevoise & Plimpton
919 Third Avenue
New York, NY 10022
    *Counsel for Appellee*
    *Elyse Douglas*

Gregory A. Markel [ARGUED]
Heather E. Murray
Seyfarth Shaw
620 Eighth Avenue
New York, NY 10018
     *Counsel for Appellee*
     *Jatindar S. Kapur*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Sheet Metal Workers Local No. 80 Pension Trust Fund and Westchester Teamsters Pension Fund ("the Funds") brought a putative securities fraud class action against Hertz Global Holdings, Inc. ("Hertz" or "the Company") and several of its current and former executives for violating §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and Rule 10b-5, 17 C.F.R. § 240.10b-5. The Funds appeal the District Court's dismissal of their fourth amended complaint ("FAC") for failure to plead a strong inference of scienter, as required by the PSLRA. We will affirm.

## I.   Background

### A.   Allegations in the FAC[1]

The Funds allege that Hertz, through its former Chief Executive Officer Mark Frissora, former Chief Financial Officer Elyse Douglas, and former Senior Vice President of Finance and Corporate Controller Jatindar Kapur (collectively, the "Individual Defendants")[2] violated the securities laws by making materially false and misleading statements concerning the Company's financial results, internal controls, and future earnings projections. The Funds' securities fraud allegations rely on a financial restatement Hertz issued with its fiscal year 2014 Form 10-K ("the Restatement"). In it the Company admitted that "an inconsistent and sometimes inappropriate tone at the top was present under the then existing senior management" and that the tone "resulted in an environment which in some instances may have led to inappropriate accounting decisions and the failure to disclose information critical to … effective review[.]" (App. at 609.)

---

[1]   The facts contained in this section come from allegations in the FAC, documents the FAC referenced or relied upon, and matters of which we may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

[2]   The FAC also named as defendants Hertz's former interim CFO David Rosenberg and its current CFO Thomas Kennedy, but the Funds do not appeal the District Court's dismissal of the claims against those defendants.

The Restatement corrected material errors to Hertz's 2011, 2012, and 2013 financial statements that, cumulatively, "[overstated] its pre-tax income ... by $215 million and its net income … by $132 million." (App. at 467.) Those errors stemmed from misstatements relating to fifteen distinct accounting categories, causing Hertz to make twenty separate accounting adjustments to its previous financial statements. Those accounting errors were, in turn, a result of "four categories of material weaknesses in [Hertz's] internal control over financial reporting": control environment, risk assessment, information and communication, and monitoring. (App. at 609.)

As the Individual Defendants were overseeing Hertz's accounting department, which was having to deal with the "inappropriate tone" they set, the Company continued to report "record" financial results and publish optimistic anticipated future earnings. That information was disseminated through press releases; public statements made by Frissora and Douglas to analysts and investors during phone calls and industry conferences; and SEC filings. Moreover, Hertz's SEC filings included Sarbanes-Oxley Act ("SOX") certifications signed by Company executives – including the Individual Defendants – attesting to the accuracy of the information contained in the relevant filings and to the sufficiency of the Company's internal accounting controls. Throughout much of 2013 and early 2014, the defendants relied on Hertz's financial results from fiscal years 2012 and 2013 to tout the Company's healthy financial position and to project a rosy financial outlook for the future. As the Restatement made clear, however, those financial results were materially inaccurate; Hertz's projections of

6

future earnings were misguided; and the Company's internal controls throughout the relevant period were deficient.

The accounting problems permeating Hertz's accounting department began incrementally coming to public attention in late 2013, culminating in the Restatement issued on July 16, 2015. Hertz began revealing its problems in September 2013, when it walked back its projected earnings for fiscal year 2013. That announcement came just days after Hertz abruptly announced Douglas's resignation for "personal reasons[.]" (App. at 516.) Next, in March 2014, Hertz disclosed through an SEC filing that it would have to delay filing its fiscal year 2013 Form 10-K because "it [had] identified certain adjustments relating to prior periods which … require[d] the Company to revise certain of its previously issued financial statements." (App. at 550.) Nonetheless, later that same month, the defendants continued to tout Hertz's "record results" and to publish optimistic anticipations of future earnings. As Hertz continued to emphasize its "record results," it also began to disclose that it had identified tens of millions of dollars in accounting errors relating to its 2011 and 2012 financial statements. In March 2014, however, Hertz still publicly classified those errors as non-material misstatements. About one month after revealing those errors, Hertz announced Kapur's resignation for "personal reasons." (App. at 517.)

By June 2014, Hertz had again delayed required SEC filings, publicly announced that the Company would have to restate its financial statements for 2011, and disclosed that it would also need to correct errors in its 2012 and 2013 financial statements that could potentially result in the need to issue restatements for those years as well. Hertz also initiated

7

two internal investigations that month, one to review the Company's "financial records for fiscal years 2011, 2012, and 2013," and the other to assess the internal controls the Company had in place during prior financial reporting periods. (App. at 608.) Hertz announced Frissora's resignation for "personal reasons" several months later, in September 2014. (App. at 518.)

Hertz slowly revealed the findings of its internal investigations to the public between August 2014 and July 2015 through periodic SEC filings. Those filings discussed Hertz's withdrawal of its previously announced projections for future earnings and disclosed that the cumulative effect of the identified accounting errors was material, requiring full restatements for fiscal years 2011, 2012, and 2013. Each subsequent SEC filing revised upward the magnitude of the accounting errors on Hertz's prior financial statements. Based on Hertz's financial disclosures, the Funds allege that Hertz had overstated its net income and pre-tax income by, respectively, $28.7 million (17.19%) and $69.3 million (27.18%) in 2011; $59.1 million (32.12%) and $85.6 million (23.45%) in 2012; and $44.2 million (14.64%) and $60.1 million (9.97%) in 2013.

In addition to the allegations of financial reporting fraud, the Funds also allege that during the relevant class period – February 14, 2013, to July 16, 2015 – Douglas and Kapur sold large amounts of their Hertz stock holdings, that those trades were out of line with those individuals' prior trading practices, and that those trades resulted in Douglas and Kapur profiting in an amount in excess of their respective annual salaries.

8

## B. Procedural History

The Funds filed the FAC in March 2016, approximately seven-and-a-half months after Hertz issued the Restatement and over twenty-seven months after they first initiated this lawsuit. The FAC contains numerous allegations based primarily on the admissions contained in the Restatement, which the District Court reviewed carefully. In the end, however, the Court concluded that the FAC failed to adequately plead a strong inference of scienter. The Court stated:

> Even giving [the Funds] every reasonable inference, their allegations amount to the following: Hertz discovered serious accounting problems, traced those problems back to a corporate mismanagement (and possibly even negligent conduct), publicly disclosed those problems, and updated the public every time it realized the problem was worse than previously disclosed. The FAC carefully explains how the accounting problems were caused by the Individual Defendants, but it never provides a cogent and compelling explanation how those defendants were aware that they caused those problems before Hertz discovered them. For those reasons, their claims fail.

(App. at 54.) That conclusion led to the dismissal of the FAC, and this appeal followed.

9

## II. Discussion[3]

### A. Legal Standard for Pleading Securities Fraud

To adequately allege a § 10(b) securities fraud claim, a plaintiff must plead "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014). A plaintiff must also meet the heightened pleading standards imposed by the PSLRA. *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009).

To adequately plead scienter under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A), which we have described as one "embracing [an] intent to deceive, manipulate, or defraud," either knowingly or recklessly. *Avaya, Inc.*, 564 F.3d at 252 (citation omitted). A complaint adequately pleads a strong inference of scienter "only if a reasonable person would deem the inference of scienter

---

[3] The District Court had jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 78aa. We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over a district court's dismissal of a complaint for failure to meet the pleading requirements of the PSLRA and over a district court's interpretation of the federal securities laws. *Winer Family Tr. v. Queen*, 503 F.3d 319, 325 (3d Cir. 2007).

cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). But a plaintiff does not need to come forward with "smoking-gun" evidence to meet the PSLRA's pleading requirements. *Id.* Rather, in conducting the scienter analysis, courts must analyze the complaint holistically to determine whether its allegations, "taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323.

### B.    The District Court Applied *Tellabs* Appropriately.

The Funds argue that the District Court erred when it concluded that the FAC's allegations did not give rise to a strong inference of scienter. They contend that the Court failed to adhere to the interpretive framework for assessing scienter set forth by the Supreme Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd*, and that, when analyzed appropriately, the FAC's allegations give an inference of scienter that is "at least as compelling as any opposing inference[.]" 551 U.S. at 324. More particularly, the Funds argue that the Court deviated from the *Tellabs* framework in three material ways: by failing to draw inferences favorable to them, by requiring "smoking-gun" evidence to adequately plead scienter, and by failing to consider the FAC's allegations holistically. Those contentions do not persuade us.

First, the District Court did not stray from the *Tellabs* framework by failing to make inferences only in the Funds' favor. Rather, it adhered to *Tellabs*'s explicit instruction to

11

conduct a comparative analysis by considering both inferences favorable to the Funds as well as "plausible, nonculpable explanations for the defendant's conduct[.]" *Id.* at 324. That the District Court disagreed with the Funds' preferred inferences is not a violation of the *Tellabs* framework.

Second, the Court did not effectively require the Funds to submit "smoking-gun" evidence to survive the defendants' motions to dismiss. It simply emphasized that the FAC lacked allegations connecting the fact that Hertz had "accounting problems … caused by the Individual Defendants" with an inference that "those defendants were aware that they caused those problems[.]" (App. at 54.) In other words, the Court only required the Funds to plead factual allegations supporting a cogent inference that the Individual Defendants knowingly made material misstatements, or that they made material misstatements with reckless disregard for the truth of those statements. That the Funds could not plead such allegations does not mean that the District Court effectively required them to submit "smoking-gun" evidence.

Finally, the District Court conducted the holistic review of the FAC that *Tellabs* requires. Although the Court assessed each category of the Funds' scienter allegations independently, it concluded its analysis in a separately headed sub-section – "Failure to Plead a Strong Inference of Scienter" – that stated in part:

> In sum, [the Funds] have failed to plead a strong inference [of scienter.]
> …

12

> The strongest inference of scienter comes from the Restatement. However, the Restatement is not enough by itself, so Plaintiffs had to tip the inferential scale with the four other categories of allegations. But, as explained, those categories do not strengthen the inference of knowledge or recklessness.

(App. at 54.) We have explicitly approved of scienter analyses that assess individual categories of scienter allegations individually when it is clear, as it is here, that a district court ultimately considered the allegations as a whole. *See OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 493 (3d Cir. 2016) (concluding that just because a court is "thorough in explaining why it found scienter lacking as to each asserted misrepresentation does not suggest that it did not consider the allegations as a whole"). In fact, we have adopted that interpretive approach ourselves when conducting a scienter analysis pursuant to the PSLRA. *See Avaya, Inc.*, 564 F.3d at 280 ("Although we have discussed each of the alleged facts bearing on defendants' scienter one at a time, we have heeded *Tellabs*'s command to evaluate [the plaintiffs'] allegations collectively rather than individually.").

## C. The FAC Does Not Plead a Strong Inference of Scienter.

The Funds argue that the Restatement's admission that Frissora and other Hertz senior management maintained an "inappropriate tone at the top," when viewed in conjunction with the FAC's scienter allegations, provides an inference of scienter that is "at least as compelling as any opposing [nonculpable] inference[.]" *Tellabs*, 551 U.S. at 324. To

make that argument, the Funds depend – as they did in the District Court – on five categories of scienter allegations: (1) the size and scope of the Restatement, (2) Hertz's admission of material weaknesses in its internal controls, (3) signed SOX certifications accompanying materially false SEC filings, (4) Hertz's replacement of upper management, and (5) insider trading activity by Douglas and Kapur. Like the District Court, we will assess each category of allegations individually before analyzing the FAC's allegations as a whole. We ultimately agree with the District Court that the FAC's allegations do not give rise to a strong inference of scienter.

### 1.      Size and Scope of the Restatement

The size and scope of a company's restatement of prior financial statements is one factor that courts consider when conducting a scienter analysis. *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 685 (6th Cir. 2004); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 447 (S.D.N.Y. 2005); *In re Stonepath Grp., Inc. Sec. Litig.*, 397 F. Supp. 2d 575, 587 (E.D. Pa. 2005). A company's admission even to significant accounting errors, however, "is insufficient by itself to give rise to a strong inference of scienter." *Podraza v. Whiting*, 790 F.3d 828, 838 (8th Cir. 2015).

The inferential force of a restatement is lessened when the plaintiff fails to plead particularized allegations of fraudulent intent. *Id.* at 837; *see also Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 251 (S.D.N.Y. 2012) (explaining that the magnitude of a restatement does not give rise to a strong inference of scienter if there are no allegations "that the … defendants had any contemporaneous basis to

14

believe that the information they related was incorrect"). As the District Court observed, the FAC fails to sufficiently allege either that the Individual Defendants knowingly caused Hertz's accounting personnel to engage in accounting fraud or that the accounting improprieties were so obvious that the Individual Defendants must have known about them when reporting Hertz's financial results to the public. The Court logically concluded that, although the Restatement was substantial, any inference of scienter was "circumscribed by" the fact that the accounting errors were spread across myriad accounting categories. (App. at 39.)

Moreover, the size of the Restatement was not sufficiently drastic to give rise to a strong inference of scienter absent particularized allegations of fraudulent intent. The Restatement revealed that Hertz's financial statements from 2011 to 2013 cumulatively overstated its net income by $132 million (20.23%) and its pre-tax income by $215 million (17.58%). When broken down by year, the Restatement shows that Hertz overstated those income categories by between 9.97% and 32.12%. Courts that have looked to the magnitude of a financial restatement to strengthen the inference of scienter have been faced with restatements significantly more drastic than what we have here. *See, e.g.*, *Fresno Cty. Empl. Ret. Ass'nv. comScore, Inc.*, 268 F. Supp. 3d 526, 553 (S.D.N.Y. 2017) (inferring scienter when restatement wrote off 100% of an entire accounting category); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) (inferring scienter where restatement "transformed … a company with retained earnings of approximately $185 million to a company with an accumulated deficit of approximately $178 million"); *In re MicroStrategy, Inc. Sec.*

15

*Litig.*, 115 F. Supp. 2d 620, 635-36 (E.D. Va. 2000) (inferring scienter, in part, because a restatement revealed an issuer had erroneously been reporting net income instead of net losses); *cf. Webb v. Solarcity Corp.*, 884 F.3d 844, 858 (9th Cir. 2018) (explaining that restatement disclosing that net income was overstated by 15% to 67% per quarter did not give rise to strong inference of scienter in the absence of other compelling allegations supporting scienter).

Accordingly, the size and scope of the changes highlighted in the Restatement provide at most some inference of scienter but not a strong inference.

2. Hertz's Admission of Material Weaknesses in Its Internal Controls

The Funds argue that the District Court erred by interpreting the Restatement's admission of an "inappropriate tone at the top" to be an admission of "mismanagement," as opposed to an admission of "misconduct." (Opening Br. at 28.) We agree with the District Court that the Restatement's admissions are more plausibly interpreted as admissions of mismanagement, not of affirmative misconduct on the part of the Individual Defendants. We reach that conclusion for two reasons. First, the Restatement itself explicitly links the phrase "inappropriate tone at the top" to Frissora's management style. For example, after first introducing that phrase, the Restatement continues, "[i]n particular, [Frissora's] management style and temperament created a pressurized operating environment at the Company, where challenging targets were set and achieving those targets was a key performance expectation." (App. at 609.) Second, the more plausible inference from the Restatement's use of the

16

word "tone" is that the Restatement is referring to management style and not to misconduct. The word "tone," after all, means a "style or manner of expression in speaking or writing[.]" *Tone*, Merriam-Webster's Collegiate Dictionary (10th ed. 2002).[4]

At most, then, the FAC has pleaded that the Individual Defendants presided over a poorly managed corporation and that the mismanagement created an environment in which improper accounting practices flourished. But we have long held "that an allegation of mismanagement on the part of a

---

[4] The United States Court of Appeals for the Fourth Circuit has similarly rejected an argument that an admission that a defendant company's "former senior management was 'incompeten[t]' and otherwise contributed to [a] deficient 'tone at the top'" essentially equated to an admission of "an environment which encourage[d] accounting fraud." *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 183 (4th Cir. 2009). It reasoned that admissions that a "deficient 'tone at the top'" existed "fail[ed] to suggest that defendants intentionally created an environment conducive to accounting fraud" and explained that the company had "simply admit[ted] that such an environment existed," which "fail[ed] to suggest that defendants acted with scienter[.]" *Id.* The Funds attempt to distinguish *Matrix Capital* by highlighting that the defendant company there admitted to "incompetence" whereas Hertz admitted to an "inappropriate tone." We do not find that distinction meaningful. *Matrix*'s reasoning is sound – an admission that a high-pressure management style existed in the past is not sufficient to meet the PSLRA's scienter requirement without accompanying allegations of fraudulent intent.

17

defendant will not alone support" a securities fraud claim. *Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir. 1992). Allegations of mismanagement will only support a securities fraud claim if they are coupled with allegations that the defendants were aware, or recklessly disregarded, that their mismanagement created an environment in which fraud was occurring. *See Webb*, 884 F.3d at 856 (explaining that "allegations [that] paint a picture of a mismanaged organization in need of closer financial oversight" do not give rise to an inference of scienter absent a compelling inference that defendants knew they were committing a fraud when making the material misstatements or omissions); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 760 (1st Cir. 2011) ("Allegations of corporate mismanagement are not actionable under Rule 10b–5."); *Hayes*, 982 F.2d at 106 (explaining that allegations of mismanagement can support an inference of scienter if facts are alleged "that a defendant was aware that mismanagement had occurred and" lied about the existence of that mismanagement). The FAC simply lacks sufficient allegations to compellingly imply that the Individual Defendants knew or recklessly disregarded that their actions were resulting in improper accounting practices.

Accordingly, the Restatement's admissions of material weaknesses in Hertz's internal controls, including its admission of an "inappropriate tone at the top," do not weigh in favor of inferring scienter.

18

### 3. SOX Certifications Accompanying False SEC Filings

An allegation that a defendant signed a SOX certification attesting to the accuracy of an SEC filing that turned out to be materially false does not add to the scienter puzzle in the absence of any allegation that the defendant knew he was signing a false SEC filing or recklessly disregarded inaccuracies contained in an SEC filing. *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1205 (10th Cir. 2015); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1003-04 (9th Cir. 2009). As discussed above, the FAC fails to plead facts that could plausibly lead to such an inference.

### 4. Replacement of Upper Management

The Funds argue that the Individual Defendants' resignations show scienter because they each resigned in close proximity to the public release of "bad news," the Restatement blamed the accounting irregularities on an "inappropriate tone at the top," and the Restatement explained that part of Hertz's remedial measures included hiring a new senior management team. We agree with the District Court, however, that the Individual Defendants' resignations do not materially add to an inference of scienter because the FAC lacks allegations that those resignations were a result of the Individual Defendants' involvement in a systemic fraud.

The departure of corporate executive defendants is a factor that can strengthen the inference of scienter. *See City of Dearborn Heights Act 345 Police & Fire Retirement Sys. v. Align Tech., Inc.*, 856 F.3d 605, 622 (9th Cir. 2017) (explaining that, in certain circumstances, "an employee's

19

resignation supports an inference of scienter"); *Brophy v. Jiangbo Pharm. Inc.*, 781 F.3d 1296, 1305 (11th Cir. 2015) ("Various courts have recognized that an executive officer's resignation can strengthen an inference of scienter when it occurs around the same time as an investigation."). However, while resignations causally related to a restatement's issuance can provide "evidence of the substantial accounting challenges [a] [c]ompany … faced, [they] do[] not compel an inference that [the individuals who resigned] were bent on committing fraud." *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 889 (4th Cir. 2014). For a resignation to add to an inference of scienter, a pleading must set forth allegations suggesting a compelling inference that the resignation was the result of something other than "the reasonable assumption that the resignation occurred as a result of" the release of bad news. *Zucco Partners*, 552 F.3d at 1002. In other words, for corporate departures to strengthen an inference of scienter, there must be particularized allegations connecting the departures to the alleged fraud.

Here, Douglas's resignation was announced just days before Hertz publicly released bad news stemming from the Company's accounting problems, and Frissora's and Kapur's resignations were announced within about two months of Hertz releasing similar news. Hertz freely acknowledged that it replaced executive- and management-level employees as a remedial measure to "change[] and enhance[] leadership in the business units associated with the restatement matters." (App. at 611.) As the District Court noted, the FAC's allegations make clear that "the resignations … were causally related to the bad news" ultimately resulting in the Restatement. (App. at 47).

20

But pleading scienter requires more than pleading a link between bad news and an executive's resignation. Changes in leadership are only to be expected when leadership fails. That is not, in itself, a symbol of fraud. Corporate resignations do not strengthen an inference of scienter, when, as here, the allegations do not cogently suggest that the resignations resulted from the relevant executives' knowing or reckless involvement in a fraud.

### 5. Insider Trading Activity

Demonstrating that a defendant had a motive, such as personal financial gain, to commit a securities fraud violation is a "relevant consideration" that "may weigh heavily in favor of a scienter inference[.]" *Tellabs*, 551 U.S. at 325; *see also Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246 (3d Cir. 2013) ("Though it is not necessary to plead motive to establish that a defendant acted with scienter, its presence can be persuasive when concluding a holistic review of the evidence."). Alleging insider trading is one way to plead motive. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277 (3d Cir. 2006). The mere fact that an insider sold corporate stock, however, is not enough to give rise to an inference of scienter. *City of Edinburgh*, 754 F.3d at 176; *In re Suprema*, 438 F.3d at 277.

Insider trading will strengthen an inference of scienter when the "sales of company stock by insiders … are 'unusual in scope or timing[.]'" *In re Suprema*, 438 F.3d at 277 (citation omitted). We have weighed a number of considerations when determining whether insider trading activity was "unusual in scope or timing," including "the amount of profit made, the amount of stock traded, the

21

portion of stockholdings sold, … the number of insiders involved[, and] … whether the profits were substantial relative to the seller's ordinary compensation." *Id.* (citations and quotation marks omitted).

Two considerations from the FAC's insider trading allegations add to the inference of scienter. First, the FAC alleges that both Douglas's and Kapur's insider trading activities were unusual when compared to their trading history. For example, Douglas sold Hertz stock on four occasions during the class period but had not sold any Hertz stock in the three years prior to those trades. Similarly, Kapur sold Hertz stock on five occasions during the class period but had only traded in Hertz stock one other time in the three preceding years. Those allegations support an inference of scienter. *Id.* at 278. Second, the FAC alleges that Douglas earned a net profit of approximately $4 million on her insider trades, which exceeded her 2013 salary of $3 million. Although the FAC does not identify Kapur's salary, it alleges that the approximately $3.1 million in profit he earned from his trading activities likely exceeded his annual compensation, given that he was Douglas's subordinate. *Compare id.* (inferring scienter when profits from trading activities "nearly doubled in one day the total amount of money" a defendant had earned "over the previous three years combined"), *with Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 553 (5th Cir. 2007) (concluding that inference of scienter not strengthened by allegation that insider stock sale netted a defendant a profit equivalent to 43% of that defendant's salary).

Three other considerations, however, lessen the strength of the scienter inference to be drawn from the FAC's

22

insider trading allegations. First, the timing of the insider trades is not particularly suspicious. Douglas and Kapur sold their shares when Hertz stock was trading between $21.23 and $28.00, with the vast majority of sales occurring at a price at or below $26.14. The overall class period high, in contrast, was $31.56 on August 19, 2014. *See Greebel v. FTP Software, Inc.*, 194 F.3d 185, 206 (1st Cir. 1999) (finding timing of insider trades to be not "very suspicious" because the insiders did not sell at "high points of the stock"). The allegations do not plausibly suggest that Douglas or Kapur timed their trades to improperly benefit from any particular disclosure. The lack of any temporally suspicious trades weighs against inferring scienter from the trading activity. *See Yates*, 744 F.3d at 890 (inference that trading activity was innocent strengthened by fact that "plaintiffs do not allege that the insiders timed the sales to take advantage of any particular disclosure"); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3d Cir. 1999) (declining to infer scienter when insider trading took place three months before negative news publicly announced).

Second, the twenty-nine-month class period alleged by the Funds cautions against inferring scienter from the alleged insider trading. "[A]lleging … a lengthy class period makes it difficult to infer intent from the mere fact of a stock sale, as it is not unusual for insiders to trade at some point during their tenure with a company." *Yates*, 744 F.3d at 891. Courts have regularly concluded that an inference of scienter from insider trading is lessened when, as here, the class period is well over a year. *See id.* (concluding that forty-four month period was "inordinately long" and weighed against inferring scienter); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002) (inference of scienter lessened due to

"unusually long class period of sixty-three weeks [fifteen months]").

Third, the fact that the FAC named five individuals as defendants, but alleged insider trading only as to Douglas and Kapur, decreases the strength of the scienter inference. *See In re Advanta*, 180 F.3d at 540 (explaining that a lack of insider trading allegations against a majority of insider defendants "rais[es] doubt [about] whether the sales were motivated by an intent to profit from inflated stock prices").

A final consideration – the percentage of pre-class Hertz holdings Douglas and Kapur sold off during the class period – does not materially move the scienter needle. Douglas and Kapur sold off, respectively, 24.7% and 62.3% of their Hertz holdings.[5] As a pure percentage of stock holdings sold, those percentages are supportive of an inference of scienter. *Compare In re Suprema*, 438 F.3d at 278 (inferring scienter, in part, because defendants sold off

---

[5] Kapur contests the 62.3% figure by arguing that that figure includes the exercise of options that he never technically owned. However, "[i]n calculating the percent of holdings sold, … it is appropriate to consider not only the shares of stock that [a defendant] held prior to [his] sales, but also the shares that [he] could have sold through the exercise of options[.]" *Waters Corp.*, 632 F.3d at 760; *see also In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986-87 (9th Cir. 1999) ("Actual stock shares plus exercisable stock options represent the owner's trading potential more accurately than the stock shares alone."). Accordingly, we accept the Funds' allegation that Kapur sold 62.3% of his holdings for purposes of this motion to dismiss.

over 30% of holdings), *with Avaya, Inc.*, 564 F.3d at 279 (not inferring scienter when defendants sold 17% or less), and *In re Advanta*, 180 F.3d at 540-41 (same with regard to selling off of 5% to 7% of holdings). But the pure percentage of holdings sold tells only part of the story. Courts have routinely found that even large percentages of holdings sold at first blush appearing suspicious are not sufficient to infer scienter when other factors, such as the timing of the relevant sales, weigh against that inference. *See, e.g.*, *Yates*, 744 F.3d at 890-91 (selling 28% of holdings did not strengthen inference of scienter when not all defendants sold stock and the timing of the trades were not suspicious); *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001) (selling 69% of holdings did not strengthen inference of scienter when there was no allegation that the trades were timed to take advantage of alleged non-public information). Here, as described above, the considerations weighing against inferring scienter limit the strength of the scienter inference that can be made from the percentage of pre-class holdings sold by Douglas and Kapur.

The FAC's insider-trading allegations thus add only minimal weight to the inference of scienter.

### 6. Holistic Review

The Funds urge us to conclude that a holistic review of the FAC's allegations leads only to one plausible string of inferences – that the Individual Defendants recklessly disregarded that their "tone" would lead lower-level employees to engage in inappropriate accounting to placate their demands, then recklessly disregarded that those irregularities would lead to overstated and inaccurate

financial statements, and, consequently, recklessly disclosed materially false information through SEC filings, press releases, and public announcements. The problem the Funds face is that the inferences they propose are simply not as compelling as the opposing one drawn by the District Court: that corporate mismanagement resulted in accounting irregularities and, at most, negligent misstatements.

The FAC and Restatement make clear that the problems plaguing Hertz and its accounting department were significant, that Frissora and other members of senior management created a pressurized environment that contributed to those problems, and that those problems resulted in material misstatements regarding the Company's financial condition. But the allegations that the Individual Defendants resigned as Hertz discovered those problems, and that Douglas and Kapur sold portions of their Hertz stock holdings while those problems were ongoing, do not necessarily suggest that Hertz or its senior management were engaged in a systemic fraud. More plausible is the suggestion that the Individual Defendants were just bad leaders. The FAC's allegations do not give rise to a cogent inference that the Individual Defendants were aware that their actions were improper, that they consciously disregarded that their "tone" was causing employees to engage in erroneous accounting, or that Hertz's accounting errors were so obvious that only an attitude of reckless disregard on the part of the Individual Defendants can explain what they said and did.[6]

---

[6] The Funds argue in the alternative that we should adopt the doctrine of corporate scienter to hold Hertz liable even if the FAC does not plead a strong inference of scienter as to any of the Individual Defendants. That doctrine allows

## III. Conclusion

For the foregoing reasons, we will affirm the District Court's dismissal of the FAC.

---

a plaintiff "to plead an inference of scienter against a corporate defendant without raising the same inferences required to attribute scienter to an individual defendant." *Rahman*, 736 F.3d at 246. We have neither accepted nor rejected that doctrine and decline to do so here because the FAC's allegations would not give rise to corporate scienter under any recognized theory of that doctrine. *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 473-77 (6th Cir. 2014) (discussing different approaches to the doctrine of corporate scienter).

Furthermore, because we have affirmed the District Court's dismissal of the FAC's Section 10(b) claim, we need not address the Section 20(a) claim, which is dependent on a Section 10(b) violation. *City of Edinburgh*, 754 F.3d at 177.