**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2655
_____

CAROLE TIBBS,
                                        Appellant

v.

ELECTROCORE, INC.; FRANCIS R. AMATO;
GLENN S. VRANIAK; BRIAN POSNER;
CARRIE S. COX; MICHAEL G. ATIEH;
JOSEPH P. ERRICO; NICHOLAS COLUCCI;
THOMAS J. ERRICO; TREVOR J. MOODY;
MICHAEL W. ROSS; DAVID M. RUBIN;
JAMES L.L. TULLIS; STEPHEN L. ONDRA;
CORE VENTURES II, LLC.; CORE VENTURES IV, LLC.;
EVERCORE GROUP, LLC.; CANTOR FITZGERALD & CO.;
JMP SECURITRIES, LLC.; BTIG, LLC.
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 3:19-cv-18400)
District Judge: Honorable Zahid N. Quraishi
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
on October 29, 2024

Before: CHAGARES, *Chief Judge*, PORTER, and CHUNG, *Circuit Judges.*

(Filed:  December 5, 2024)

---

OPINION[*]

---

PORTER, *Circuit Judge.*

Carole Tibbs, lead plaintiff in this securities fraud class action suit, appeals the District Court's order dismissing her claims against all defendants. The District Court found that Tibbs failed to adequately plead falsity and scienter as to challenged statements related to electroCore's business prospects. Upon review, we concur and will affirm the District Court's judgment.

I

electroCore, Inc. manufactures and sells gammaCore, a medical device used for treating various types of headaches. In 2018 the company announced plans for an initial public offering ("IPO") of common stock. electroCore filed a registration statement and a prospectus (collectively, the "Offering Documents") with the Securities and Exchange Commission ("SEC"), outlining for prospective investors the company's present status, plans for the future, and potential risks of investment.

Among other topics, the Offering Documents discussed the importance of securing deals with "commercial payers,"[1] such as public and private health insurers, who could cover gammaCore prescriptions. Failure to secure such coverage, the Offering

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] The Offering Documents, complaint, and briefs before us variously employ "payors" and "payers." We use "payers" throughout, without denoting alterations, for convenience.

Documents warned, "could reduce physician utilization of our products and have a material adverse effect on our sales, results of operations and financial condition." App. 652. The Offering Documents disclosed that negotiations were ongoing to hopefully secure additional payers, but that electroCore had reached a coverage agreement with one large pharmacy benefit manager ("PBM"). electroCore estimated that the agreement would provide reimbursement coverage for gammaCore for about fifteen million commercial lives.[2]

Several other topics in the Offering Documents are at issue. First, the Offering Documents noted that there was a risk that electroCore would need "to seek coverage and reimbursement as a medical device or item of durable medical equipment," requiring gammaCore to be covered by industry-standard diagnostic health codes. App. 545. Second, the Offering Documents discussed electroCore's voucher program. Designed to increase demand for gammaCore, the program would provide "new patients with a one-time 31-day therapy at no charge." App. 598.

The IPO closed with the sale of 5,980,000 shares of common stock at $15.00 per share. Following the IPO, electroCore struggled to secure more commercial payers to cover prescriptions for more patients. CEO Francis R. Amato and other electroCore senior staff reported on the company's efforts on that front and communicated with investors about the voucher program. In May 2019, less than a year after the IPO closed,

---

[2] Though the prospectus did not name it, the large PBM in question was CVS Caremark. At that time, electroCore had also secured a deal with a smaller PBM, Magellan, that was estimated to cover approximately two million commercial lives.

electroCore announced that it would be downsizing from ninety-one to fifty-five employees, and that it expected a cash burn of $11 to $11.5 million for the quarter. In the months that followed, electroCore's effort to obtain FDA approval for gammaCore's use in migraine prevention was delayed. By September 2019, when this action commenced, electroCore stock had fallen as low as $1.25 per share.

Tibbs, on behalf of a class of investors who purchased electroCore stock, filed her first amended complaint in July 2020, incorporating as evidence official electroCore filings as well as statements from former electroCore insiders serving as Confidential Witnesses ("CWs"). The District Court dismissed the first amended complaint without prejudice on Defendants' motion. Tibbs filed the operative second amended complaint in October 2021, alleging claims under Sections 11, 12(a)(2), and 15 of the Securities Act and Sections 10(b) and 20(a) of the Securities Exchange Act. Defendants again moved to dismiss. The District Court again granted the motion, dismissing the action without prejudice. Tibbs informed the Court that she would not be further amending her complaint, and the Court entered a final judgment of dismissal. Tibbs timely appealed.

II[3]

"We review de novo a district court's grant of a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *Klotz v. Celentano Stadtmauer & Walentowicz LLP*, 991 F.3d 458, 462 (3d Cir. 2021). "To survive a Rule 12(b)(6) motion, a complaint must set forth enough factual allegations to 'state a claim to relief that is plausible on its

---

[3] The District Court had jurisdiction under 15 U.S.C. §§ 77v, 78aa, and 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.

4

face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Like the District Court, we "accept as true all factual allegations in the complaint and view those facts in the light most favorable to the non-moving party." *Id.* Along with the complaint, a court must consider "exhibits attached to the complaint . . . as well as undisputedly authentic documents if the complaint's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## A. Securities Act claims

Sections 11 and 12(a)(2) of the Securities Act create a cause of action for investors duped into buying securities by misleading registration statements and prospectuses respectively. 15 U.S.C. §§ 77k(a), 77*l*(a)(2). To state a claim under these sections, the plaintiff must adequately allege that the challenged document contained an untrue statement of material fact or that the document omitted information necessary to make other included disclosures not misleading. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 269 (3d Cir. 2006). Such claims may be brought against an array of actors involved in preparing the challenged document, and liability for misleading statements is "virtually absolute." *Id.* (quoting *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 274 n.7 (3d Cir. 2004)). The plaintiff "need only show a material misstatement or omission to establish his prima facie case"; no showing of scienter is required. *Id.* (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)). "[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor: The inquiry . . . is objective." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186–87 (2015).

5

Tibbs discusses the Offering Documents collectively, and her Section 11 and Section 12(a)(2) misleading-statement allegations likewise overlap. The bulk of those allegations relate to the nature and details of electroCore's agreement with CVS at the time of the IPO. Tibbs also contests statements and omissions about diagnostic health codes and the voucher program, and alleges violations of Items 303 and 503 of Regulation S-K, which outline how registrants should disclose factors that might have an impact on the registrant's business.

### i. "Commercial payers" and the CVS agreement

Obtaining reimbursement coverage by commercial payers was crucial to electroCore's success. The prospectus noted that driving reimbursement was a "key element[]" of electroCore's strategy, and that failure to obtain such coverage would "negatively impact[]" the business. App. 534, 536. The prospectus later reported the status of reimbursement agreements at the time of the IPO:

> We have agreements with commercial payers in place that we believe, based on our estimates, will provide for reimbursement for gammaCore as a pharmacy benefit for approximately 17 million commercial lives, with such number expected to increase to as many as 45 million lives under these agreements over the next several calendar quarters.

App. 534.

Tibbs argues that these statements materially misrepresented the then existing types of payer agreements. In particular, Tibbs contends that "'[c]ommercial payer' is a term generally describing a publicly traded insurance company such as United Health." Opening Br. at 23. CVS Caremark and Magellan are PBMs, not insurance companies. Thus, Tibbs says, electroCore employed language that would deceive investors about the

6

reimbursement situation.

Tibbs alleges three other misrepresentations about the PBM agreements. First, based on CW testimony, that the number of covered commercial lives was much lower than the 17 million approximated. Second, that the statement falsely implied that reimbursements under the agreements were already ongoing. And third, that the statement failed to disclose provisions of the CVS agreement that would limit the circumstances under which gammaCore would be prescribed.

The District Court rejected these arguments. First, as to the meaning of "commercial payers," the District Court found that the Offering Documents used it as an umbrella term to include both PBMs and insurance companies. For example, the prospectus's "Risk Factors" section includes a warning that "[w]hile some commercial payers may provide coverage under their pharmacy benefit plans, other third-party payers, including government health programs and private insurers, may not be willing or able." App. 545. The District Court observed that the Offering Documents use the more specific phrase "commercial insurance payers" at times, and a later reference to the CVS agreement explicitly states that it is with "a large PBM." App. 535, 653. The District Court thus concluded that a reasonable investor, reading the challenged statement "in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information," would not find it misleading as to the type of agreements then in place. App. 21–22 (quoting *Omnicare*, 575 U.S. at 190).

Second, the District Court found that the Offering Documents' qualified statements that electroCore "believed, based on [its] estimates," that the agreements with

7

CVS Caremark and Magellan would cover "approximately 17 million commercial lives" were not misleading. App. 535–56, 619, 652–53. The Court was unconvinced by the testimony of CW3,[4] who claimed that electroCore received a "determination" from CVS before the IPO that gammaCore would not be "on [CVS's] template formulary." App. 456. According to the second amended complaint, "CW3 further clarified that . . . CVS's position" was that CVS would not promote gammaCore but would cover it if approached by a plan manager. App. 456. The District Court thus found CW3's contention that the CVS agreement covered "7 million [lives] at most" to be "mere opinion," rather than a statement of facts known by electroCore pre-IPO. App. 24, 456. That was not enough, the Court held, to turn the Offering Documents' own heavily caveated statements of opinion—*i.e.*, the coverage estimates—into material misrepresentations.

Third, the District Court held that the wording of the challenged statements did not imply that reimbursement under the CVS agreement had already begun. Rather, as the District Court highlighted, the prospectus consistently spoke in the future tense: "we believe [the agreements] *will* provide for reimbursement"; "we anticipate . . . that approximately 15 million U.S. commercial lives *will shortly* have access to our therapy." App. 24, 535–36, 619, 652 (emphasis added). No reasonable investor reading these projections in context could think otherwise.[5]

---

[4] CW3 was a Confidential Witness who "was employed with electroCore from April 2015 to January 2019 as VP of Payer and Provider Strategies." App. 455.
[5] Though the District Court did not address this argument as fully as it might have, the record (*i.e.*, the language of the Offering Documents) amply supports the District Court's conclusion.

Fourth and finally, the District Court found that the Offering Documents contained significant disclaimers regarding risks and possible barriers to coverage. For example, the prospectus disclosed that "no uniform policy of coverage and reimbursement for [gammaCore] exists among third-party payers," and that "[t]herefore, coverage and reimbursement for [gammaCore] can differ significantly from payer to payer." App. 545. Consistent with its earlier dismissal order, the District Court again held that the Offering Documents did not misleadingly "imply that electroCore's payer agreements covered gammaCore without limitations." App. 25, 50.

We agree with the District Court's conclusions on each score. The Offering Documents consistently use "commercial payers" as an umbrella term; if any uncertainty remains about the nature of the CVS agreement, it is dispelled when the prospectus explicitly describes the agreement as being with "a large PBM."[6] App. 653. electroCore's lives-covered estimates were statements of opinion; neither CW3's competing opinion, nor the fact that those estimates ultimately proved too optimistic, renders them material misrepresentations. A reasonable investor would not read the Offering Documents to state that reimbursement under the CVS agreement was already underway, and the Offering Documents clearly disclosed the risk of coverage limitations. For those reasons, we will affirm the District Court's conclusion that the Offering Documents did not contain a material misstatement or omission regarding the CVS agreement.

---

[6] Tibbs points to two post-IPO statements that seem to refer to commercial payers as distinct from PBMs. Whatever their probative value, those instances do not change how a reasonable investor would understand the terms as they are used in the context of the Offering Documents.

## ii. Health codes and the voucher program

Tibbs challenges two other omissions from the Offering Documents. She points first to electroCore's difficulties with qualifying gammaCore for industry standard diagnostic codes for drugs and medical devices. electroCore's efforts to obtain Healthcare Common Procedure Coding System ("HCPCS") and National Drug Code codes for gammaCore met with setbacks, and electroCore failed to secure either code by the time of the IPO. Without such codes, a drug or device is less likely to be covered by a commercial payer. Thus, Tibbs concludes, omission of the code failures from the Offering Documents was materially misleading.

Next, Tibbs points to a change in electroCore's voucher program in early 2018. Recall that, as explained in the prospectus, the idea of the program was to get gammaCore out to potential patients at no cost to them, increasing visibility and demand for the product. At first, commercial payers were billed for any gammaCore prescriptions, and electroCore would then pay for the device. In 2018, the program changed such that gammaCore prescriptions were sent straight to electroCore, which shipped a device to fill the prescription. CW3 alleged that this new strategy failed to create a record that potential commercial payers could use to gauge demand for gammaCore. Tibbs argues that this change harmed electroCore in the long run, and thus that its omission from the Offering Documents was material and actionable.

The District Court found that the Offering Documents disclosed electroCore's "difficulty and risks of obtaining insurance coverage," and that nothing in them "suggest[ed] that electroCore was necessarily eligible for certain diagnostic codes." App.

10

27 (internal quotation omitted). Because omission of the code issues did not make existing statements misleading, the District Court held that Tibbs's pleading failed to clear the bar. As to the voucher issue, the District Court found that CW3's allegation amounted to a difference of opinion about business strategy. Noting that such opinions are generally not actionable, the District Court held that omission of the alleged negative effects of the voucher program change was not misleading.

On appeal, Tibbs points to a single sentence from the prospectus that she says was rendered misleading by electroCore's omission of the diagnostic code issues. The "Our Pipeline" section, describing electroCore's plans moving forward, states that some commercial payers "may require us to seek coverage for gammaCore as a medical supply or item of durable medical equipment." App. 651. Tibbs argues that this was misleading because the stymied diagnostic code efforts showed that electroCore "could not get coverage as a medical equipment." Opening Br. at 35 (emphasis omitted). But as Tibbs acknowledges elsewhere, electroCore's efforts continued, and it ultimately secured HCPCS codes for gammaCore. There was thus nothing misleading in the Offering Documents' disclosure of the future risks and costs associated with seeking code coverage, or in its omission of the failure of those efforts to date.

As to the voucher program, Tibbs summarily contends that CW3's prediction of the negative effects of the program change "was not a strategy disagreement, but a factual verifiable result of a business decision." Opening Br. at 36. This assertion is hard to credit. Whether the voucher program change would prove effective in the long term was not "information in [electroCore's] possession at the time" of the IPO. Opening Br. at 36

11

(quoting *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023)); *see also Omnicare*, 575 U.S. at 186 ("[Section 11] does not allow investors to second-guess inherently subjective and uncertain assessments."). Nor has Tibbs identified any specific statements in the Offering Documents allegedly rendered misleading by omission of the program change. *See* App. 465–66. Like the District Court, we conclude that the omission was not actionable.

### iii. Regulation S-K

Regulation S-K imposes additional disclosure requirements for registration statements. 17 C.F.R. § 229.10(a). Item 303 requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii) (2017).[7] At the time of electroCore's registration statement, Item 503 required disclosure of "the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c) (2011).[8]

Tibbs musters her previous allegations, in particular the number of covered lives under the CVS agreement and the lack of diagnostic health codes, against electroCore's registration statement risk disclosures. Tibbs argues that electroCore knew for a fact that the CVS agreement would not cover 15 million lives, and that the early 2018 failure to secure diagnostic codes was a done deal, not a possible future risk to coverage.

---

[7] Item 303 has been amended and reorganized since electroCore's registration statement, but this requirement is substantively unchanged. *See* § 229.303(b)(2)(ii).

[8] Now found at Item 105, the amended requirement extends to "material factors" rather than "the most significant factors." 17 C.F.R. § 229.105(a).

12

The District Court rejected these arguments, incorporating much of its earlier reasoning. It found that Tibbs failed to allege trends or uncertainties that were known to electroCore at the time of the IPO, and that were not covered in the registration statement's extensive disclosures. Surveying precedent, the District Court found that the health code and voucher program omissions fell short of the high bar of "most significant factors," and that the risk disclosures on those subjects were "at the level of specificity required by item 503(c)." App. 28; *see EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 872 (3d Cir. 2000) (omitted information is material if it "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988))).

We hold that Tibbs failed to adequately plead violations of Items 303 and 503 of Regulation S-K, for many of the same reasons already discussed. Namely: CW3's contention about how many lives the CVS agreement would cover was an opinion, not a statement of fact then known to electroCore, and the failure to secure diagnostic codes was not a permanent defeat, but a temporary setback. The registration statement adequately disclosed the risks associated with these and other aspects of electroCore's business plan.

iv. Section 15

When an entity violates Section 11 or 12 of the Securities Act, Section 15 of the Act creates joint and several liability for any person with control over that entity. 15

13

U.S.C. § 77o. Because we hold that electroCore did not violate Sections 11 and 12, we will likewise affirm the District Court's dismissal of Tibbs's Section 15 claims.

B. Securities Exchange Act claims

Section 10(b) of the Securities Exchange Act prohibits the "use or employ[ment], in connection with the purchase or sale of any security[,] . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Pursuant to that authority, the SEC promulgated Rule 10b-5, which makes it unlawful for any person:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. Unlike Securities Act claims, § 10(b) claims must allege scienter, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)); *see also In re: Hertz Global Holdings Inc.*, 905 F.3d 106, 114 (3d Cir. 2018) (listing elements of a § 10(b) claim).

Such claims must also meet the heightened pleading standard imposed by the Private Securities Litigation Reform Act. 15 U.S.C. § 78u-4; *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009). A plaintiff must "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A). Those facts will suffice "only if a reasonable person would deem the inference of scienter

14

cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. "[C]ourts must analyze the complaint holistically to determine whether its allegations, 'taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Hertz*, 905 F.3d at 114 (quoting *Tellabs*, 551 U.S. at 323).

Tibbs alleges that various post-IPO statements and filings by electroCore and its officers were materially false and misleading. The falsity claims largely mirror those discussed above—the nature of the CVS agreement, the number of covered lives, barriers to insurance coverage, and the voucher program change. In support of her § 10(b) claim, Tibbs included a section of "Additional Scienter Allegations." App. 509. In short, those allegations include: (1) that electroCore needed fast money to successfully commercialize gammaCore; (2) that electroCore was a small company whose officers were knowledgeable about core operations; (3) that the employee defendants were privy to internal meetings and reports on the company's status; and (4) that several employee defendants held significant shares in the company, and one of them, J. Errico, made a large sale of 100,000 shares in early 2019.

Reviewing these allegations, the District Court concluded that Tibbs failed to adequately plead scienter. That holding was grounded in part on the Court's earlier rejection of Tibbs's falsity claims—whether individual defendants knew that "electroCore did not have agreements in place with insurance companies" was immaterial because the individual defendants, whether in the Offering Documents or in post-IPO statements, did not represent otherwise. App. 31. The Court also found that Tibbs's high-

15

level allegations that individual defendants had knowledge of electroCore's business, standing alone, were not enough. *See Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 247 (3d Cir. 2013) ("[G]eneral awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegations of specific information conveyed to management and related to fraud." (quoting *Avaya*, 564 F.3d at 270)). The Court found Tibbs's motive allegations—*i.e.*, that electroCore needed a quick influx of cash to succeed—neither cogent nor compelling.

On appeal, Tibbs faults the District Court for disregarding certain post-IPO statements in its scienter analysis and recapitulates her falsity arguments. She also cites to cases in which a company's small size or the importance of the topics at issue were considered probative of an inference of scienter. *See, e.g.*, *In re Egalet Corp. Sec. Litig.*, 340 F. Supp. 3d 479, 512 (E.D. Pa. 2018); *Rabkin v. Lion Biotechs., Inc.*, No. 17-cv-02086-SI, 2018 WL 905862, at *12 (N.D. Cal. Feb. 15, 2018).

We agree with the District Court that Tibbs failed to adequately plead scienter. Tibbs goes to great lengths to demonstrate individual defendants' knowledge of electroCore's operations and plans, including the details of the CVS agreement, possible barriers to obtaining insurance coverage, and the diagnostic coding effort. App. 509–14. But the post-IPO statements that Tibbs relies on, like the Offering Documents statements analyzed above, are not misleading. That lack of falsity undercuts any inference of scienter, and Tibbs's circumstantial pleadings fail to make up the difference.

For instance, Tibbs points to a late 2018 press release and an earnings call with electroCore's CEO. Both statements highlighted "continuing negotiations" with CVS and

other payers, and described an expectation that covered lives would increase to around 30 million in the first quarter of 2019. App. 482–83. Tibbs argues that these statements were materially misleading, pointing again to CW3's "7 million [lives] at most" comment. App. 486. But she concedes that the agreement "was still being negotiated." *Id.* CW3's months-old opinion about the then-existing agreement fails to create a strong inference that these later statements were false, much less that they were fraudulently intended.

Tibbs also points to a post-IPO development: electroCore's efforts to get FDA approval for gammaCore's use in migraine prevention. In August 2019, electroCore issued a press release announcing that FDA had recently "accepted for review electroCore's 510(k) premarket notification" and that "[t]he company expects to receive the FDA's decision by the end of 2019." App. 506; *see also* App. 507 (electroCore's CEO making nearly identical statements in an earnings call). Tibbs alleges, based on CW testimony, that electroCore knew at that time "that the FDA had concerns about the robustness of electroCore's data supporting the use of gammaCore for migraine prevention." App. 507. Tibbs argues that this allegation "mak[es] Defendants' positive statements about impending 501(k) clearance misleading through omission." Reply. Br. at 19. But the challenged statements do not predict FDA *approval*, merely a decision. Even assuming the truth of Tibbs's allegations about electroCore's knowledge, she has not identified statements rendered misleading by the failure to disclose vague "concerns" held by the FDA, nor do her pleadings create a strong inference of an intent to deceive or defraud.

Finally, contrary to Tibbs's contention, the District Court did not disregard the

17

post-IPO statements. The Court exhaustively walked through each allegation in the facts section of its order; it was not required to address each allegation individually in its scienter analysis, a necessarily "holistic[] . . . collective[]" enterprise. *Hertz*, 905 F.3d at 114 (quoting *Tellabs*, 551 U.S. at 323). That analysis correctly found that Tibbs's pleadings failed to create a strong inference of scienter, and thus failed to state Exchange Act § 10(b) claims.

Section 20(a) is the Exchange Act equivalent of Securities Act § 15, discussed above, creating liability for those who controlled a person otherwise held liable under the Act. 15 U.S.C. § 78t. As above, so here: Tibbs's failure to plead an underlying § 10(b) violation necessarily precludes her § 20(a) claim.

\* \* \*

III

For all these reasons, we will affirm the District Court's order dismissing Tibbs's second amended complaint.